SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Anasia Maison v. New Jersey Transit Corporation** **(A-34/35-19) (083484)**

**Argued September 29, 2020 -- Decided February 17, 2021**

**ALBIN, J., writing for the Court.**

In this appeal, the Court considers whether, under the New Jersey Tort Claims Act (TCA), the heightened duty-of-care standard governing private common carriers applies to public common carriers such as defendant New Jersey Transit Corporation (NJ Transit). The Court also considers whether NJ Transit and the defendant bus driver are shielded from liability by any of the three TCA immunities they invoke, as well as whether comparative fault could be allocated to the unidentified teen who threw a bottle that struck plaintiff Anasia Maison in the forehead while on an NJ Transit bus.

In July 2013, Maison, a twenty-year-old college student, boarded an NJ Transit bus operated by defendant Kelvin Coats and took a seat towards the rear of the bus. Two rows behind her were four to five male teenagers.

Maison testified that as soon as the bus pulled away, the teenagers verbally harassed her, and one threw an object striking her in the face. The harassment continued, with one of the teenagers brandishing a knife. Fearful, Maison unsuccessfully attempted to change her seat. As the teenagers left the bus, one threw a bottle hitting Maison in the face. Maison called out for help, and a passenger gave her a cell phone, which she used to call the police and an ambulance. Maison was transported to a hospital, where she was treated for a serious and permanent injury to her forehead.

Coats testified that he knew that there was a threat to Maison. He acknowledged that his job was to get his passengers "from point A to B safely" but also stated in his deposition testimony that "it's not my job to get involved." After Maison was struck, he followed NJ Transit's procedure and pushed a button to call NJ Transit's control center. Coats waited for about fifteen minutes before the control center returned his call. The control center then contacted the police and emergency medical services. Coats admitted that he monitored the situation in the rear of the bus and that he did not stop the bus, tell the young men to "knock it off," call the police, or contact NJ Transit's control center until after Maison was hit with the bottle. The police never apprehended the young men who assaulted Maison.

1

Maison filed a complaint alleging that NJ Transit and Coats breached their common-carrier duty to protect her from the wrongful acts of co-passengers and that, as a result of their negligence, she sustained severe and permanent injuries.

The trial court determined that, as a matter of law, the common-carrier standard of care applied to defendants; TCA immunities did not shield defendants from liability; and comparative fault could not be allocated to the unidentified bottle thrower. The jury returned a liability verdict against defendants and awarded Maison $1,800,000.

The Appellate Division affirmed as to the common-carrier standard and the lack of immunity, but it found that the trial court erred in not submitting to the jury the decision whether to allocate fault between the intentional tortfeasor -- the bottle thrower -- and defendants. See 460 N.J. Super. 222, 233-42 (App. Div. 2019). It did not disturb the damages award and remanded for a new trial at which a jury would determine what percentage of fault, if any, should be allocated to the bottle thrower. Id. at 242.

The Court granted defendants' petition for certification "limited to the issues of whether New Jersey Transit buses and drivers are subject to the common carrier standard of negligence and whether defendants have immunity under the Tort Claims Act." 240 N.J. 243 (2019). The Court also granted Maison's cross-petition for certification on whether fault could be allocated to the bottle thrower. See ibid.

**HELD:** NJ Transit and its bus drivers are held to the same negligence standard under the TCA as other common carriers -- to exercise the utmost caution to protect their passengers as would a very careful and prudent person under similar circumstances. See N.J.S.A. 59:2-2(a), :3-1(a). None of the TCA immunities defendants asserted abrogated their common-carrier duty to protect Maison from the dangerous and threatening conduct of the teenage passengers. The TCA leaves no doubt that an allocation of fault between a negligent public entity and its employee and an intentional tortfeasor is mandated. See N.J.S.A. 59:9-3.1. Nevertheless, to ensure that defendants' duty to protect their passenger is not unfairly diluted or diminished, the trial court must give the jury clear guidance on the factors to consider in allocating degrees of fault. See Frugis v. Bracigliano, 177 N.J. 250, 274-75, 281-83 (2003).

1. By common law and statutory definitions, NJ Transit is a common carrier for hire. For well over a century, the common law has imposed a heightened standard of care on common carriers that requires them to exercise "utmost caution" to protect their passengers, which includes "the duty to protect passengers from wrongful acts of co-passengers, if the utmost care could have prevented those acts from injuring a passenger." Model Jury Charges (Civil), 5.73(A)(2). Here, the Court determines whether the heightened common-carrier standard applies to public transit systems and is consistent with the TCA. (pp. 20-23)

2

2.  The TCA declares that "the public policy of this State [is] that public entities shall only be liable for their negligence within the limitations of [the TCA]."  N.J.S.A. 59:1-2 (emphasis added).  It does not limit liability to "ordinary negligence."  The spectrum of negligence includes the duty to exercise reasonable or prudent care and the duty to exercise the utmost care, as in the case of common carriers.  The Legislature is presumed to have been aware of case law holding that under the doctrine of negligence, the degree of the duty owed to the public depends on the kind of activity undertaken and the risk involved.  The TCA directs that liability is to be imposed on public entities for the acts or omissions of their employees "in the same manner and to the same extent as . . . private individual[s] under like circumstances," N.J.S.A. 59:2-2(a), and on public employees "to the same extent as . . . private person[s]," N.J.S.A. 59:3-1(a).  That directive strongly implies that similarly situated public common carriers and private common carriers are not to be treated in a different manner or to a different extent for liability purposes.  When the Legislature adopted a more rigorous standard for holding a public entity liable in N.J.S.A. 59:4-2, it did so explicitly through the "palpably unreasonable" standard.  And neither N.J.S.A. 59:2-3 nor the pre-TCA case on which defendants rely limits liability to ordinary negligence.  (pp. 23-29)

3.  A number of jurisdictions hold public entities to the same heightened common-carrier standard as private carriers; others do not impose the heightened common-carrier on either.  In the rare instance where a jurisdiction has imposed a dual standard -- a heightened duty of care for privately owned carriers but a lesser, ordinary duty of care for a public carrier -- it has departed from the traditional common law rule only after its legislature specifically abrogated that rule by a clearly written statute.  (pp. 29-33)

4.  A passenger's expectation of safety on a bus does not vary depending on who owns the carrier, and the Court held long ago that the heightened common-carrier standard applied to trolleys operated by NJ Transit's predecessor.  See Harpell v. Pub. Serv. Coordinated Transp., 20 N.J. 309 (1956).  The TCA does not command a discordant result.  The Court holds that NJ Transit and its bus drivers are governed by the same common-carrier standard applicable to private carriers, and notes that they are liable only for the wrongful acts of co-passengers who present "dangers that are known or are reasonably foreseeable," and only "if the utmost care could have prevented" the harm.  See Model Jury Charges (Civil), 5.73(A)(2).  (pp. 34-36)

5.  Public officials are cloaked with immunity from tort claims under certain circumstances designated in the TCA.  Public employees and public entities, however, have the burden to plead and prove an immunity under the TCA.  Typically, for purposes of judicial economy, a public entity or public employee should assert the immunity in a pre-trial motion for summary judgment.  The Court shares the trial court's concerns about defendants' delay in raising several claims of immunity until the time of trial, and it disapproves of the assertion of a TCA immunity for the first time in a post-trial motion, but it considers the merits of each immunity asserted.  (pp. 36-37)

3

6.  N.J.S.A. 59:5-4 provides immunity for failure to provide police protection.  The statute's dominant theme is discretionary governmental decisionmaking.  Faced with a factual scenario similar to this one, the California Supreme Court held that the California provision that was the model for N.J.S.A. 59:5-4 did not apply; it found that "warning unruly passengers to behave, ejecting those who refuse to behave, and summoning the assistance of police" do not involve political or budgetary decisions or constitute "police services" or the type of discretionary decisions falling within the ambit of the immunity.  Lopez v. S. Cal. Rapid Transit Dist., 710 P.2d 907, 914-15 (Cal. 1985).  Here, Maison does not claim that NJ Transit should have allocated more resources for security or that Coats should have acted as would a police officer or thrust himself in harm's way to quell the disturbance on the bus.  Maison merely maintains that the duty to exercise the utmost care required that Coats take one or more of the common-sense steps -- telling the teens "to knock it off," pulling the bus over, or calling NJ Transit control or the police -- that he admitted were available to him.  N.J.S.A. 59:5-4 does not apply here.  (pp. 37-41)

7.  Nor are defendants immune from liability on the basis that they failed to enforce a law under N.J.S.A. 59:2-4 (public entity) and N.J.S.A. 59:3-5 (public employee).  In a post-trial motion, defendants pointed to various regulations promulgated by NJ Transit, governing the standards of behavior to be followed by passengers, which they purported that Coats failed to enforce.  The Court explains that defendants failed to develop a record on this issue.  Further, the critical causative conduct giving rise to Maison's injuries and her legal claims was defendants' breach of their common-carrier duties -- their failure to protect her from the reasonably foreseeable dangerous conduct of other passengers, not from Coats's purported failure to enforce NJ Transit's regulations. (pp. 41-46)

8.  And defendants are not shielded from liability for good-faith enforcement of a law under N.J.S.A. 59:3-3.  Defendants qualify for this immunity only if they engaged in some act or acts to enforce a law.  N.J.S.A. 59:3-3 does not apply to this case -- a claim of negligent inaction -- because Coats did not act to enforce any law.  (pp. 46-47)

9.  Frugis v. Bracigliano controls the outcome of the allocation-of-fault issue in this case.  In Frugis, the Court held that the TCA explicitly mandated apportionment of damages in cases involving negligent public entities and "other tortfeasors," regardless of whether the other tortfeasors' conduct was intentional.  177 N.J. at 276 (quoting N.J.S.A. 59:9-3.1).  And the plain language of N.J.S.A. 59:9-3.1 requires an apportionment of fault between tortfeasors, without exception, and regardless of whether a tortfeasor is named as a party in the action.  The Court recognizes the policy concern that permitting comparative fault might tend to dilute or diminish the common carrier's duty.  See Frugis, 177 N.J. at 268, 273, 281-83.  But that is a policy choice made by the Legislature, and in the seventeen years since the Frugis decision, in which the plaintiffs raised that policy concern, the Legislature has not amended the TCA's comparative-fault statute.  (pp. 47-51)

4

10.  Although the TCA mandates allocation of fault in this case, the Court is mindful of the challenge presented to a jury in apportioning fault between a negligent common carrier and an intentional tortfeasor who committed the very harm the carrier was obligated to protect against.  And the Court acknowledges the strong public policy considerations that counsel in favor of giving guidance to the jury to minimize the likelihood of diluting the carrier's responsibility.  The Court therefore sets forth specific jury instructions that should be given in addition to the model common-carrier charge, Model Jury Charges (Civil), 5.73(A).  (pp. 51-52)

11.  On remand, the trial court should charge the new jury with the additional instructions and, after apportionment, mold the verdict accordingly.  The Court disapproves of the Appellate Division's directive in this case that if the new jury finds that the injuries inflicted by the bottle thrower were "so foreseeable" to the bus driver, then the entirety of the fault may be allocated to defendants.  See 460 N.J. Super. at 241-42.  Nevertheless, foreseeability is an important factor to be considered in the determination of apportionment.  Otherwise, the Court affirms the Appellate Division, including its determination that the damages award should stand and that the new jury should not be informed about the amount of the award.  (pp. 52-53)

**AFFIRMED AS MODIFIED.  REMANDED to the trial court.**

**JUSTICE PATTERSON, concurring in part and dissenting in part,** concurs that NJ Transit cannot rely on the TCA immunities that it asserts in this case, but disagrees with the imposition of the heightened "common carrier" standard of care on NJ Transit.  Noting that the Legislature made clear when it enacted the TCA that its waiver of sovereign immunity was strictly limited by the terms of the statute itself, and is not subject to expansion by case law, Justice Patterson considers the TCA's plain language -- confirmed by its legislative history -- to express the Legislature's clear intent:  a public entity or employee sued for ministerial acts and not entitled to immunity may be held to the standard of reasonable care that governs ordinary negligence claims, but not a heightened duty of care.  In Justice Patterson's view, with no signal from the Legislature that it intends to subject NJ Transit to expanded liability under a heightened standard, the majority effects a stark and unwarranted change in the law.  Justice Patterson concurs that the TCA mandates the opportunity to allocate fault between NJ Transit and the intentional tortfeasor, but finds that the majority's jury charge presses the jury to allocate most -- if not all -- of the fault in this case to NJ Transit, which departs both from the statutory intent that the trier of fact independently determine the allocation of fault and from the courts' traditionally neutral presentation of apportionment questions to juries.

**CHIEF JUSTICE RABNER and JUSTICES SOLOMON and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.  JUSTICE PATTERSON filed a separate opinion concurring in part and dissenting in part, in which JUSTICES LaVECCHIA and FERNANDEZ-VINA join.**

Anasia Maison,

Plaintiff-Respondent/Cross-Appellant,

v.

New Jersey Transit Corporation and
Kelvin Coats,

Defendants-Appellants/Cross-Respondents.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
460 N.J. Super. 222 (App. Div. 2019).

| Argued | Decided |
| --- | --- |
| September 29, 2020 | February 17, 2021 |

Daniel M. Vannella, Assistant Attorney General, argued the cause for appellants/cross-respondents (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel, and Daniel M. Vannella, on the briefs).

K. Raja Bhattacharya argued the cause for respondent/cross-appellant (Bendit Weinstock, attorneys; K. Raja Bhattacharya and Sherri Davis Fowler, on the briefs).

Edward J. Fanning, Jr., argued the cause for amici curiae New Jersey Business & Industry Association, Commerce and Industry Association of New Jersey, and New Jersey Chamber of Commerce (McCarter & English, attorneys;

Edward J. Fanning, Jr., and David R. Kott, of counsel and on the brief, and Benjamin D. Heller, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

Every day, throughout this state, thousands of people take buses and trains to commute to work, visit family and friends, and travel to vacation spots. Those modes of transportation are known as common carriers. Passengers pay fares to common carriers to safely transport them to their destinations. Under the common law, privately owned carriers owe their passengers a heightened duty of care to act with the utmost caution to protect them, even from the wrongful acts of co-passengers -- a duty to act as would a very careful and prudent person in light of the circumstances.

Today, public corporations like defendant New Jersey Transit Corporation (NJ Transit) are largely responsible for providing mass public transportation. NJ Transit is a common carrier to whom passengers entrust their lives and safety every day, including during their commutes to and from work. The preeminent issue before us is whether, under the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to :12-3, the heightened duty-of-care standard governing private common carriers protects equally those people who ride on public common carriers such as NJ Transit.

2

In this case, plaintiff Anasia Maison on her commute home from work took an NJ Transit bus. During the ride, a group of four to five teenagers verbally and physically harassed her as the bus driver silently watched and drove on. Despite the escalating threats and unruly behavior toward Maison, the bus driver did nothing -- did not call out the teenagers, stop the bus, or contact NJ Transit or the police. As one of the teenagers disembarked, he threw a bottle striking Maison in the forehead, causing a permanent and serious injury.

Maison filed a negligence action against defendants NJ Transit and the bus driver alleging that they breached their duty to protect her from the foreseeable dangers presented by the violent conduct of the teenage passengers.

The trial court determined that, as a matter of law, the common-carrier standard of care applied to defendants; TCA immunities did not shield defendants from liability; and comparative fault could not be allocated to the unidentified bottle thrower. The jury returned a liability verdict against defendants and awarded Maison $1,800,000.

Although the Appellate Division agreed with the trial court that the common-carrier standard of care applied to defendants and no provision of the TCA immunized defendants from liability, it nevertheless found that the trial

court erred in not submitting to the jury the decision whether to allocate fault between the intentional tortfeasor -- the bottle thrower -- and NJ Transit and its bus driver. It did not disturb the damages award and remanded for a new trial at which a jury would determine what percentage of fault, if any, should be allocated to the bottle thrower.

We affirm and modify the judgment of the Appellate Division. We hold that NJ Transit and its bus drivers are held to the same negligence standard under the TCA as other common carriers -- to exercise the utmost caution to protect their passengers as would a very careful and prudent person under similar circumstances. See N.J.S.A. 59:2-2(a), :3-1(a). We also hold that defendants are not shielded from liability by the TCA immunities of failure to provide police protection, N.J.S.A. 59:5-4; failure to enforce a law, N.J.S.A. 59:2-4, :3-5; and good-faith enforcement of a law, N.J.S.A. 59:3-3. None of those immunities abrogated defendants' common-carrier duty to protect Maison from the dangerous and threatening conduct of the teenage passengers. Last, we part from the Appellate Division's conclusion that the jury may decide that, because defendants' duty of care to their passengers encompasses their duty to protect Maison from the wrongful conduct of other passengers, no allocation of fault is necessarily required. The TCA leaves no doubt that an allocation of fault between a negligent public entity and its employee and an

4

intentional tortfeasor is mandated.  See N.J.S.A. 59:9-3.1.  Nevertheless, to ensure that defendants' duty to protect their passenger is not unfairly diluted or diminished, the trial court must give the jury clear guidance on the factors to consider in allocating degrees of fault.  See Frugis v. Bracigliano, 177 N.J. 250, 274-75, 281-83 (2003).

Accordingly, we remand for a new trial on allocation of fault consistent with this opinion.

I.

A.

Anasia Maison filed an amended complaint in the Law Division, alleging that NJ Transit and its bus driver Kelvin Coats breached their common-carrier duty to protect her from the wrongful acts of co-passengers and that, as a result of their negligence, she sustained severe and permanent injuries.[1]  Only three witnesses testified at trial -- Maison, Maison's mother, and Coats.  Their trial testimony presented the critical facts at issue in this case.

On July 21, 2013, Maison, a twenty-year-old college student, was working at a New York City pharmacy until her shift ended at 12:00 a.m. on July 22.  On her way back home to Newark, she first took an NJ Transit train

---

[1] The procedural history detailing the dismissal of the original complaint that led to the filing of the present complaint is not germane to this appeal.

to Penn Station in Newark, arriving there at around 1:00 a.m. At Broad and Market Streets, she boarded an NJ Transit bus operated by defendant Coats. She paid her fare and took a seat towards the rear of the bus. Two rows behind her were four to five male teenagers.

Maison testified that as soon as the bus pulled away, she was struck on the side of her face by an unknown object "thrown very hard" by one of the teenagers. She turned to them and asked, "why are [you] bothering me?" One of the young men said to his friends that Maison "should 'f' one of them up." A few seconds later, another object was thrown at her, but it hit only the chair. She turned again and asked the young men to stop harassing her. They told her "to shut the f**k up" and loudly hurled insults at her. In response, Maison admittedly used foul language, but the stream of profanities from the young men continued. Maison could see the bus driver, Coats, watching the commotion in his rearview mirror, but Coats kept driving.

When one of the teenagers brandished a knife, Maison said "out loud," "I need help." Although she could not tell whether Coats heard her, she saw that he was peering at her through his rearview mirror. Frightened, Maison got up and moved toward the front of the bus, but when a passenger told her, "[you] better not come up here," she returned to her seat where the insults continued to rain down on her. She tried to make a call from her cell phone,

6

but the signal failed -- and the attempted call caught the attention of the youths.  A minute or two later, one of the teenagers rang the bell for the bus to stop.  As they were leaving through the rear side door of the bus, Maison heard a passenger tell one of them, "don't do it" -- and then, all of a sudden, a bottle struck her in the face.  As she bled from the forehead, the youths continued to taunt and threaten her through the open door of the bus.

Maison called out for help, yelling:  "I need ambulance.  I need police." Coats remained in his seat.  A passenger gave her a cell phone, which she used to call the police and an ambulance.  After the ambulance arrived, Maison was transported to Beth Israel Hospital, where she received twenty-two stiches to treat the wound to her forehead -- the site now of a permanent scar that has left her self-conscious about her appearance.  In the aftermath of the attack, she suffered from very bad headaches and delayed her college graduation.

In his testimony, Coats recalled that Maison boarded the bus at about 1:14 a.m. and, immediately afterwards, four to five young men entered and took seats behind her.  As he drove, he observed through his rearview mirror the young men and Maison "cursing back and forth" -- "a lot of b's and f's."[2]

---

[2]  In his deposition testimony made part of the record, Coats recalled that the "shouting and yelling" continued from the time the teenagers boarded the bus until they exited, but in his trial testimony, he stated that the "nasty" verbal exchanges died down at some point.

A passenger interceded and said to the young men, words to the effect of, "don't disrespect her, don't call her the b word." According to Coats, Maison "was handling herself very well." He monitored the situation and knew that there was a threat to Maison. He acknowledged that his job was to get his passengers "from point A to B safely" but also stated in his deposition testimony read to the jury that "it's not my job to get involved. First of all, my safety comes first."

Seven to eight minutes into the drive from Broad and Market Streets, where the verbal conflict began, someone pressed the bell for the Hayes Circle stop. Arriving there, Coats opened the front and rear doors, and then he heard "a smack," "glass breaking," and "Maison screaming." He looked back and saw that Maison had been hit and was bleeding profusely and that a passenger was consoling her. Coats got up, observed the shattered pieces of a liquor bottle on the ground and seats, and asked if she wanted an ambulance or the police. She "screamed," "yes."

Coats, however, did not call directly for an ambulance or the police. He followed NJ Transit's procedure and pushed a button to call NJ Transit's control center. Coats waited for about fifteen minutes before the control center returned his call. The control center then contacted the police and emergency

8

medical services. Coats did not believe that NJ Transit policy permitted him to use his cell phone to contact first responders.

Coats stated that he never observed the young men throw objects at Maison or flash a knife, never heard Maison call out to him, and never saw her get out of her seat. He admitted that he monitored the situation in the rear of the bus during the seven- to eight-minute ride to Hayes Circle and that he did not stop the bus, tell the young men to "knock it off," call the police, or contact NJ Transit's control center until after Maison was hit with the bottle.

The police never apprehended the young men who tormented and assaulted Maison.

## B.

In her amended complaint, Maison did not assert a cause of action or claim for contribution against the unidentified bottle thrower. The trial court denied defendants' requests that the unidentified bottle thrower be included on the verdict sheet for purposes of allocation of either fault or damages and that the jury be charged on ordinary negligence instead of common-carrier liability. After the close of the evidence, the court rejected defendants' application for a directed verdict based on the TCA immunities of good-faith enforcement of

the law, N.J.S.A. 59:3-3, and failure to provide police protection, N.J.S.A. 59:5-4.[3]

The jury was charged on the law applicable to common carriers, as set forth in Model Jury Charges (Civil), 5.73(A)(2), "Carriers for Hire" (approved June 1988).  The court instructed the jury that

> [a] common carrier must exercise a high degree of care to protect its passengers from dangers that are known or reasonably foreseeable.  Carriers must use the u[t]most caution to protect their passengers.  The kind of caution that is characteristic of a very careful and prudent person.  A carrier must act with the highest possible care consistent with the nature of the undertaking involved.  This includes the duty to protect passengers from wrongful acts of co-passengers if the u[t]most care could have prevented those acts from injuring a passenger.
>
> If a danger was known or reasonably could have been anticipated[,] the carrier has a duty to protect its passenger from any injury that could be caused by that danger.

The jury returned a verdict finding both NJ Transit and Coats liable. The jury also found that Maison sustained a permanent disfigurement from her injury and awarded her $1,800,000 in damages.

In a written opinion, the trial court denied defendants' motion for judgment notwithstanding the verdict, a new trial, or a remittitur.  The trial

---

[3]  The court asked defendants' counsel what law the bus driver was "executing or enforcing."  He responded, "[c]andidly I'm at a loss to articulate one."

10

court ruled that the TCA did not abrogate the heightened common-carrier standard of care for public carriers. It underscored the language in the TCA that, in the absence of an applicable immunity, public entities and public employees are liable "in the same manner and to the same extent" as private companies and private persons "under like circumstances." See N.J.S.A. 59:2-2(a); see also N.J.S.A. 59:3-1(a).

The court also rejected again defendants' arguments that the TCA's police-protection and good-faith-enforcement-of-any-law immunities shielded defendants from liability.[4] According to the court, the police-protection immunity did not apply because the case was not about whether defendants failed to provide sufficient police-protection services or properly allocated resources but rather about whether Coats breached his duty as a bus driver to stop the bus or timely call the police or NJ Transit's control center.

The court, moreover, pointedly dismissed defendants' newly raised post-trial argument that the good-faith-enforcement-of-any-law immunity applied because specific NJ Transit regulations governed the conduct of passengers and Coats should be presumed to have been enforcing them. The court noted that defendants presented neither evidence nor argument during trial to support

---

[4] Although the court addressed the merits of defendants' motion, it questioned whether "[d]efendants improperly withheld their claims of immunity until the day of trial, under the guise of in limine motions."

11

that TCA immunity and, in any event, the trial evidence showed that Coats did not take any affirmative step to enforce a law.

The court also found that defendants' argument that Coats was protected from liability by the failure-to-enforce-any-law immunity, N.J.S.A. 59-3-5 -- an argument raised for the first time post-trial -- was neither cognizable on a new trial motion nor legally supported by the record.[5]

Finally, the court reaffirmed its earlier determination to exclude from the verdict sheet the unidentified bottle thrower, who was not named in the pleadings as a John Doe joint tortfeasor by the parties. The court concluded that N.J.S.A. 59:9-3.1 permits an allocation of fault only when other potentially liable defendants or third-party defendants are named in the pleadings.

## C.

The Appellate Division affirmed in part and reversed in part, remanding for a new trial only on the allocation of fault between the bottle thrower and

---

[5] Likewise, the court found meritless defendants' first-time-raised post-trial claim that the exercise of Coats's judgment involved discretionary as opposed to ministerial acts, entitling defendants to immunity under N.J.S.A. 59:2-3(a) and :3-2(a). The court emphasized that the discretionary immunity implicates policy-making, judgmental decisions, not the ministerial inaction that occurred on Coats's bus. Defendants abandoned that argument on appeal.

12

defendants.[6] Maison v. NJ Transit Corp., 460 N.J. Super. 222, 242 (App. Div. 2019).

The Appellate Division concluded that the trial court correctly held NJ Transit to "the common carrier standard of negligence" and observed that "our case law has viewed bus lines generally, and public transit systems specifically, as common carriers for many years." Id. at 233 (citing, e.g., Lieberman v. Port Auth. of N.Y. & N.J., 132 N.J. 76 (1993); Harpell v. Pub. Serv. Coordinated Transp., 20 N.J. 309 (1956)).

The Appellate Division also found none of the TCA immunity defenses asserted by defendants meritorious, deciding to elide the issue of whether those defenses were timely raised. Id. at 236. The police-protection immunity, N.J.S.A. 59:5-4, did not apply because Coats failed to perform the ministerial duty of taking certain steps to protect Maison -- steps that did not require discretionary calls about the allocation of resources. Id. at 236-37. The failure-to-enforce-any-law immunity, N.J.S.A. 59:3-5, did not apply because nothing in the record suggested that Coats had a duty to enforce a law or regulation; rather, Coats's breach of duty related to his failure to take certain actions expected of a common carrier. Id. at 233-34, 237. The good-faith-enforcement-of-any-law immunity, N.J.S.A. 59:3-3, did not apply because the

---

[6] We recite only those issues relevant to this appeal.

13

harm to Maison resulted from Coats's inaction, not from his taking a specific act that fell within the scope of the immunity. Id. at 237-38.

Last, the Appellate Division determined that the trial court erred in not placing the bottle thrower on the verdict sheet to allow for the allocation of fault among the tortfeasors. Id. at 238-42. It reasoned that when a public entity and public employee are subject to a negligence action that involves other alleged tortfeasors, N.J.S.A. 59:9-3.1 requires an apportionment of fault, even if the other tortfeasors are not identified or joined as parties. Id. at 238-41.

The Appellate Division, however, noted an exception to that general rule when the defendant's duty to provide security encompasses the obligation to prevent a tortfeasor's wrongful conduct. Id. at 241 (citing Martin v. Prime Hosp. Corp., 345 N.J. Super. 278, 287 (App. Div. 2001)). According to the Appellate Division, in that scenario where a tortfeasor's infliction of injury on a plaintiff was "so foreseeable," imposing the entire fault on the common-carrier defendants may be warranted if they failed to adequately respond to the threat. Id. at 241-42 (quoting Martin, 345 N.J. Super. at 292-93). In that circumstance, "[t]he determination of foreseeability is a factual inquiry left to the jury." Id. at 242.

The Appellate Division remanded the case for a new trial limited to a jury making that determination and, if necessary, apportioning fault. Ibid. It discerned, however, "no reason to disturb the damages award" and instructed the trial judge to inform the new jury that an earlier jury found that defendants were both at fault and the proximate cause of Maison's damages. Ibid. In short, the Appellate Division left to the new jury to decide whether Coats's inadequate response led to clearly foreseeable injuries to Maison such that full liability should be imposed on defendants. Ibid.

We granted defendants' petition for certification "limited to the issues of whether New Jersey Transit buses and drivers are subject to the common carrier standard of negligence and whether defendants have immunity under the Tort Claims Act." 240 N.J. 243 (2019). We also granted Maison's cross-petition for certification on whether the Appellate Division erred in finding that fault could be allocated to the bottle thrower. See ibid. We granted the joint motion of the New Jersey Business & Industry Association, the Commerce and Industry Association of New Jersey, and the New Jersey Chamber of Commerce to participate as amici curiae.

## II.

### A.

Defendants urge this Court to reverse the judgment of the Appellate Division on several grounds. Defendants argue that they are not subject to the heightened standard of care required of common carriers -- a standard that they say is "irreconcilable with the TCA." They contend that their duty is capped at the standard of "ordinary prudence" or "palpable unreasonableness."

They also claim that Maison's negligence action should have been dismissed based on the TCA immunities, emphasizing that public entities and employees "do not have the duty to do everything that might be done." Defendants maintain that the police-protection immunity, N.J.S.A. 59:5-4, shields from liability public transit authorities that fail to protect passengers from even foreseeable violent acts committed by "bad actors" on a bus or train. The immunity is a defense, they say, to the failure of Coats to eject the unruly teenagers, to call the NJ Transit Hotline or the police, or to "otherwise protect Maison from [the bottle thrower]."

Likewise, defendants reason that the failure-to-enforce-any-law immunities, N.J.S.A. 59:2-4, :3-5, bar their liability because Maison's claim, in disguise, is that Coats had a duty to enforce NJ Transit regulations prohibiting passengers from engaging in tumultuous behavior, throwing

16

objects, or threatening or striking others. Even if Coats's conduct were to be construed as "a negligent affirmative act," defendants contend that they are protected by the good-faith-enforcement-of-any-law immunity under N.J.S.A. 59:3-3 and N.J.S.A. 59:2-2(b).

Last, defendants submit that the Appellate Division correctly remanded for a new trial to allocate the bottle thrower's share of fault but that it erred in directing that the jury "determine whether all fault should be allocated against [defendants] and only 'if necessary, apportion fault.'" (emphasis added) (quoting Maison, 460 N.J. Super. at 242). They state that, under N.J.S.A. 59:9-3.1, the TCA requires an apportionment of fault, even between a negligent public employee and public entity and an intentional tortfeasor, such as the bottle thrower. (citing Frugis, 177 N.J. at 278-81).

The amici curiae business associations are aligned with defendants in support of the position that a non-party tortfeasor, such as the bottle thrower, "should be listed on the jury's verdict sheet."

### B.

Maison urges the Court to reverse the Appellate Division's remand for an allocation of fault between defendants and the bottle thrower and to otherwise affirm the jury's verdict and damages award.

Maison argues that apportionment of fault is inappropriate because defendants' duty to provide her safe passage on the bus encompassed the obligation to prevent the attack against her. (citing Blazovic v. Andrich, 124 N.J. 90, 111 (1991)). She maintains that a common carrier, such as NJ Transit, has a duty to exercise the utmost care in protecting its passengers from known or reasonably foreseeable dangers, including the wrongful acts of other passengers, and that to allow the allocation of fault to the intentional wrongdoer -- the bottle thrower, whose actions defendants should have prevented -- dilutes and diminishes defendants' common-carrier duty. Maison, moreover, contends that the Appellate Division's standard for allocating fault is unworkable because the jury has received no instruction on how to decide whether the bottle thrower's actions were "so foreseeable" as to warrant imposing total liability on defendants.

In all other respects, Maison presses for the affirmance of the Appellate Division's holdings that the heightened common-carrier standard governs this case and is not at odds with the TCA and that none of the TCA immunities are applicable. Maison is dismissive of defendants' assertion of the police-protection immunity because defendants' shortcomings had nothing to do with the allocation of resources or the exercise of discretion but had everything to do with a bus driver's complete inaction -- the failure to fulfill ministerial,

18

common law duties to secure the safety of a passenger. She asserts that the failure-to enforce-any-law immunity fails because defendants did not present any evidence that Coats had a duty to enforce NJ Transit's regulations and that the good-faith-enforcement-of-any-law immunity fails as well because Maison suffered harm not from Coats's action but rather from his inaction. In short, Maison contends that defendants' liability is based on their breach of their common-carrier duties.

### III.

Three issues are presented to the Court: (1) whether defendants are subject to the heightened negligence standard generally governing common carriers; (2) whether one or more TCA immunities shield defendants from liability; and, if not, (3) whether the non-party tortfeasor -- the bottle thrower -- should have been included on the verdict sheet for the purpose of allocating fault.

All three issues involve questions of law. In construing a statute or the common law our review is de novo. Qian v. Toll Bros. Inc., 223 N.J. 124, 135 (2015). "We therefore owe no deference to the interpretative analysis of either the trial court or Appellate Division, unless we are persuaded by the reasoning of those courts." Estate of Narleski v. Gomes, 244 N.J. 199, 213 (2020) (citing Qian, 223 N.J. at 135).

19

We first turn to whether NJ Transit is subject to the common-carrier standard of care.

IV.

A.

The common law has described common carriers as entities or persons that hold themselves out to the public as being in the business of transporting passengers. See Schott v. Weiss, 92 N.J.L. 494, 495 (E. & A. 1918) ("Common carriers of passengers are those who undertake to carry all persons indifferently, who apply for passage."); see also Model Jury Charges (Civil), 5.73(A) ("A common carrier undertakes for pay to carry all persons who apply for passage . . . ."). Operators of buses for hire have long been considered common carriers. See, e.g., Miller v. Pub. Serv. Coordinated Transp., 7 N.J. 185, 186-90 (1951); Schott, 92 N.J.L. at 494-95; see also Model Jury Charges (Civil), 5.73(A) ("Typical common carriers are . . . buses . . . ."). The statutory definition of "common carrier" includes any individual, corporation, or public agency "operating motor buses or rail passenger service on established routes within this State or between points in this State and points in adjacent states." Lieberman, 132 N.J. at 85 (quoting N.J.S.A. 27:1A-65(b)).[7]

_____

[7] Although the definition of "carrier" in N.J.S.A. 27:1A-65 is part of L. 1973, c. 126, an enactment establishing reduced bus fares for senior citizens, in

20

For example, the Port Authority Trans-Hudson (PATH) train system, a rapid transit system jointly operated by the governments of New Jersey and New York, "meets the definition of a 'common carrier'" under N.J.S.A. 27:1A-65. Id. at 86. So does NJ Transit.

By the common law and statutory definitions, NJ Transit is a common carrier for hire. NJ Transit is a public corporation created by the New Jersey Public Transportation Act of 1979, N.J.S.A. 27:25-1 to -24, that is tasked with maintaining "a coherent public transportation system" in this state, N.J.S.A. 27:25-2(b), (e), which includes the operation of a motor bus service, see N.J.A.C. 16:83-1.1; N.J.S.A. 27:25-3(b).

For well over a century, the common law has imposed a heightened standard of care on common carriers. See, e.g., Schott, 92 N.J.L. at 495 ("As a common carrier, the defendant owed . . . a passenger for hire in the jitney bus, a high degree of care for his safety."); City Ry. Co. v. Lee, 50 N.J.L. 435, 438 (E. & A. 1888) ("The duty of a carrier in transporting passengers is one which calls for a high degree of care . . . ."); see also Derwort v. Loomer, 21 Conn. 245, 253 (1851) ("The rule of law . . . is fully established, in our own courts and elsewhere, . . . . that in the case of common carriers of passengers, the

---

Lieberman, we accepted that definition as the one that generally applies to common carriers in other statutory contexts. 132 N.J. at 85.

highest degree of care which a reasonable man would use, is required."
(emphasis omitted)).  The rationale for the heightened common law standard of
care is that the common carrier has "committed to his trust the safety and lives
of people, old and young, women and children, locked up . . . in the coach or
rail-car, ignorant, helpless, and having no eyes, or ears, or power to guard
against danger, and who look to him for safety in their transportation."
Derwort, 21 Conn. at 253-54; see also Robert J. Kaczorowski, The Common-
Law Background of Nineteenth-Century Tort Law, 51 Ohio St. L.J. 1127, 1158
(1990).

That heightened standard of care requires carriers to exercise "great
caution to protect [their passengers], . . . 'the utmost caution characteristic of
very careful prudent men,' or 'the highest possible care consistent with the
nature of the undertaking.'"  Harpell, 20 N.J. at 316-17; see also Model Jury
Charges (Civil), 5.73(A); Prosser & Keeton on Torts § 34, at 208-09 (5th ed.
1984).  A common carrier's duty to exercise "utmost caution" includes "the
duty to protect passengers from wrongful acts of co-passengers, if the utmost
care could have prevented those acts from injuring a passenger."  Model Jury
Charges (Civil), 5.73(A)(2).

In Lieberman, we held that the Port Authority Bus Terminal, a bus
depot, unlike PATH, is not a common carrier under the statutory definition,

22

although both are controlled by the Port Authority of New York and New Jersey. 132 N.J. at 86. Thus, a rail line is a common carrier, but a bus depot is not. Ibid. Based on that distinction, we concluded that the Port Authority could not be held "to the high standard of care imposed on common carriers for an assault that occurred in the [bus] Terminal." Ibid. That statement suggested that the PATH train system referenced in Lieberman -- and therefore NJ Transit by analogy -- would be held to the common-carrier standard.

This case gives this Court the opportunity to authoritatively answer the question not directly at issue in Lieberman -- whether the heightened common-carrier standard applies to public transit systems and is consistent with the TCA. Or does the TCA impose a lesser standard of care on public carriers?

### B.

The Legislature enacted the TCA, L. 1972, c. 45, in response to this Court's decision in Willis v. Department of Conservation & Economic Development, 55 N.J. 534, 536-40 (1970), which "abrogated common-law sovereign immunity in tort cases against public entities." Frugis, 177 N.J. at 275. Although the Legislature clearly recognized that "the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done," it did not suggest that the government had no duty to act when

23

something might be done to promote the public good in clearly defined circumstances. See N.J.S.A. 59:1-2. Thus, the TCA declares that "the public policy of this State [is] that public entities shall only be liable for their negligence within the limitations of [the TCA]." Ibid. (emphasis added).

Within the sphere of the TCA, public entities and public employees -- unlike private companies and their employees -- have the benefit of multiple immunities that shield them from liability. N.J.S.A. 59:2-1(a) (stating that a public entity is not liable in tort "[e]xcept as otherwise provided by this act"). With those immunities and other exceptions in mind, the TCA provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A. 59:2-2(a) (emphasis added); see N.J.S.A. 59:3-1(a) ("Except as otherwise provided by this act, a public employee is liable for injury caused by his act or omission to the same extent as a private person." (emphasis added)). The TCA, therefore, in the absence of an applicable immunity, generally contemplates a symmetry of treatment between government actors and private actors. See N.J.S.A. 59:2-2(a), :3-1(a).

Although the TCA states that "public entities shall only be liable for their negligence," N.J.S.A. 59:1-2, by its language, the TCA does not limit

24

liability to "ordinary negligence."  At the time of the passage of the TCA in 1972, the common law defined negligence by different degrees in recognition that an actor's duty corresponds to the nature and risk of the undertaking.  We stated in Harpell that "[n]egligence is a matter or risk" -- a risk of a "recognizable danger of injury," and that "[a]s the danger becomes greater, the actor is required to exercise caution commensurate with it."  20 N.J. at 316 (emphasis added) (quotations omitted).  In light of that unremarkable statement, we noted that common "[c]arriers who accept passengers entrusted to their care must use great caution to protect them."  Ibid. (quotations omitted).  The spectrum of negligence includes the duty to exercise reasonable or prudent care and the duty to exercise the utmost care, as in the case of common carriers.  Prosser & Keeton, § 34, at 208-14 (discussing the differing degrees of negligence).  Indeed, Model Civil Jury Charge 5.73 -- the jury instruction for cases involving carriers for hire -- is denominated in the category of "Other Negligence Actions."

We presume, as we must, that at the time of the enactment of the TCA, the Legislature was aware of our case law -- aware that, under the doctrine of negligence, the degree of the duty owed to the public depends on the kind of activity undertaken and the risk involved.  See Farmers Mut. Fire Ins. Co. of

25

Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 543 (2013) ("The Legislature is presumed to be aware of the decisional law of this State.").

The TCA's directive that liability is to be imposed on public entities and public employees "in the same manner and to the same extent as . . . private individual[s] under like circumstances," N.J.S.A. 59:2-2(a), and "to the same extent as . . . private person[s]," N.J.S.A. 59:3-1(a), strongly implies that similarly situated public common carriers and private common carriers are not to be treated in a different manner or to a different extent for liability purposes.

For example, picture two buses carrying thirty passengers from the same terminal to the same destination, one a privately owned bus and the other an NJ Transit bus. Does the operator of the privately owned bus have a duty to exercise the utmost care in ensuring that the tires are inflated and not bald and the brakes are in proper working order but the NJ Transit bus operator have a lesser duty -- the duty of exercising only ordinary care in ensuring the safety of its passengers? The equivalent-duty requirement of N.J.S.A. 59:2-2(a) and 3-1(a) answers that question: the duty to provide safe travel to passengers on NJ Transit buses is no less urgent than the duty imposed on privately owned bus operators.

If the Legislature intended to limit the liability of public entities and public employees to the standard of ordinary negligence, presumably, it would

26

have said so in the text of the TCA. See DiProspero v. Penn, 183 N.J. 477, 492 (2005) (noting that we cannot "presume that the Legislature intended something other than that expressed by way of the plain language" (quoting O'Connell v. State, 171 N.J. 484, 488 (2002))). The Legislature knew how to create a more rigorous standard for holding a public entity liable, as it did in chapter four of the TCA, by adopting the "palpably unreasonable" standard for addressing liability of a public entity for a condition of public property.[8]

Defendants attempt to make much of a statement in the pre-TCA case of Fitzgerald v. Palmer that "[i]f government does act, then, when it acts in a manner short of ordinary prudence, liability could be judged as in the case of a private party," 47 N.J. 106, 109 (1966) -- a statement repeated in the 1972 Attorney General Task Force Comment to N.J.S.A. 59:2-3(d). First, that statement in Fitzgerald merely proclaims that the government should be held to the same standard as a private party -- in that case the applicable standard was ordinary negligence. See 47 N.J. at 109. Ordinary negligence, after all, is the standard that will apply in most cases involving either private parties or public entities. Second, the main thrust of Fitzgerald was a discussion about the

---

[8] N.J.S.A. 59:4-2 provides that "[n]othing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable."

distinction between discretionary and ministerial acts in determining the liability of a government entity, not standards of liability. See id. at 109-10. That too is the predominant theme of N.J.S.A. 59:2-3. The Task Force Comment to N.J.S.A. 59:2-3(d) concludes by stating, "this section adopts the test commonly applied by the courts that a public entity or public employee is liable for negligence in the performance of ministerial duties." Report of the Attorney General's Task Force on Sovereign Immunity 213 (1972) (emphasis added). Importantly, although N.J.S.A. 59:2-3 uses the term "negligence," it does not define the term or use such language as ordinary negligence or the exercise of ordinary prudence.

We cannot superimpose a judicial standard on the term "negligence" that is at odds with its long-held meaning in the common law, e.g., Harpell, 20 N.J. at 316, and how the Legislature must have understood that term when it was imported into the TCA. See Serrano v. Serrano, 183 N.J. 508, 518 (2005) (declining to "superimpose" a standard not expressed in the statute at issue). Had the Legislature intended to limit the duty of a public common carrier, it knew how to do so.

We therefore determine that the heightened common-carrier standard applies to public carriers like NJ Transit. That approach finds support in the decisions of the California Supreme Court in Lopez v. Southern California

28

Rapid Transit District, 710 P.2d 907 (Cal. 1985), and the Texas Supreme Court in VIA Metro. Transit v. Meck, ___ S.W.3d ___ (Tex. 2020), both of which construed their Tort Claims Acts to treat publicly and privately owned carriers similarly -- and in the decisions of many other jurisdictions that apply the higher duty of care to public carriers.

C.

We begin with a discussion of Lopez, a case involving the application of the common-carrier standard under the California Tort Claims Act (California TCA). Lopez is significant "[b]ecause the California Tort Claims Act was the model for [New Jersey's TCA], [and] we often consider interpretations of [the California] Act when interpreting our own." Garrison v. Township of Middletown, 154 N.J. 282, 289 (1998) (citing Levin v. County of Salem, 133 N.J. 35, 46 (1993)).

In Lopez, the California Supreme Court determined that the statutory common-carrier standard governing privately owned carriers -- a standard requiring the exercise of "the utmost care and diligence" to ensure the safe transport of passengers -- applied equally to public carriers, consistent with the California TCA. 710 P.2d at 909-14.[9] The court held that the common-carrier

_____

[9] California, unlike New Jersey, codified by statute the common-carrier duty. See Cal. Civ. Code § 2100. That statute embodies the common law standard. Compare ibid. (requiring "utmost care and diligence"), with Harpell, 20 N.J. at

29

duty for private and public carriers alike includes "a duty to use utmost care and diligence -- whatever that may require in a particular case -- to protect its passengers from assaults by fellow passengers." Id. at 910. In the face of disorderly conduct by passengers threatening the safety of other passengers, the court asserted that duty might require a bus driver to "warn the unruly passengers to quiet down or get off the bus," "alert the police and summon their assistance," or "if necessary, eject the unruly passengers." Id. at 910-11 (citations omitted). The simple rationale for the heightened standard, the court explained, is that passengers, for a fare, "have put their safety, and even their lives, in the carrier's hands" while "sealed in a moving steel cocoon" and "if trouble arises, [they] are wholly dependent upon the bus driver to summon help or provide a means of escape." Id. at 912; see also Derwort, 21 Conn. at 253-54.

The Texas Supreme Court recently reached a similar conclusion, finding that the common law standard requiring privately owned common carriers "to exercise a 'high degree of care' for their passengers" applied equally, under

---

316-17 (requiring "utmost caution characteristic of very careful prudent men"). California's statutory common-carrier standard does not distinguish between public and private carriers. See Cal. Civ. Code § 2100. Lopez imported the statutory common-carrier standard into California's TCA. See 710 P.2d at 909 n.2.

30

the Texas Tort Claims Act (Texas TCA), to a public transit authority responsible for "carrying tens of millions of passengers a year." Meck, ___ S.W.3d at ___ (slip op. at 1-2). The Texas high court rejected the argument "that a governmental entity cannot be a common carrier" and that the term "negligence," which is used but left undefined in the Texas TCA, "always and only involves the breach of a duty to exercise the ordinary care a reasonable person would exercise under the same or similar circumstance." Id. at ___ (slip op. at 9-11). The court acknowledged that the common law recognizes differing "degrees of negligence" and that one form of negligence is the "higher duty" that Texas courts have imposed "on common carriers since nearly [the] inception" of the common-carrier standard in Texas 165 years ago. Id. at ___, ___ (slip op. at 3, 12-14). It also declined to accept the transit authority's position that if the Legislature intended the Texas TCA's negligence standard for public-employee-driven vehicles "to encompass more than ordinary negligence, it would have said so as it did in other subchapters of the Act." Id. at ___ (slip op. at 18-19). Accordingly, the court applied the high-degree-of-care duty to a personal-injury case in which the transit authority's bus driver abruptly stopped his vehicle, causing an oncoming passenger to fall and sustain injuries. Id. at ___, ___ (slip op. at 1-2, 19).

31

Like California and Texas, other jurisdictions hold public entities to the same heightened common-carrier standard as private carriers. See, e.g., Metro. Atlanta Rapid Transit Auth. v. Rouse, 612 S.E.2d 308, 308 (Ga. 2005) ("A carrier of passengers, such as MARTA, must use extraordinary diligence to protect the lives and persons of its passengers."); Krywin v. Chi. Transit Auth., 938 N.E.2d 440, 447 (Ill. 2010) (finding that the Chicago Transit Authority was a common carrier and had "a duty to its passengers to exercise the highest degree of care . . . to carry them safely to their destinations"); Brant v. Tri-Cnty. Metro. Transit Dist. of Or., 213 P.3d 869, 872 (Or. Ct. App. 2009) ("Tri-Met is a common carrier and therefore owes its passengers the highest degree of care and skill practicable for it to exercise." (quotation omitted)); Mangini v. Se. Pa. Transp. Auth., 344 A.2d 621, 623 (Pa. Super. Ct. 1975) ("There is no dispute that appellant SEPTA is a common carrier and therefore held to the highest degree of care."); see also Montgomery v. Midkiff, 770 S.W.2d 689, 690 (Ky. Ct. App. 1989) (applying heightened common-carrier standard); Washington Metro. Area Transit Auth. v. Seymour, 874 A.2d 973, 977 (Md. 2005) (same); Magaw v. Mass. Bay Transp. Auth., 485 N.E.2d 695, 696-98 (Mass. App. Ct. 1985) (same); Anderson v. Transit Auth. of Omaha, 491 N.W.2d 311, 314 (Neb. 1992) (same); White v. Metro. Gov't of Nashville & Davidson Cnty., 860 S.W.2d 49, 52 (Tenn. Ct. App. 1993) (same).

32

Some jurisdictions, however, do not impose the heightened common-carrier standard on either privately or publicly owned carriers. See, e.g., Bingham v. N.Y.C. Transit Auth., 864 N.E.2d 49, 51-52 (N.Y. 2007) (holding public authority operating city subway must "exercise reasonable care" to maintain safe means of ingress and egress, which is the same duty as private carriers).

Even in the rare instance where a jurisdiction has imposed a dual common-carrier standard -- a heightened duty of care for privately owned carriers but a lesser, ordinary duty of care for a public carrier -- it has departed from the traditional common law rule only after its legislature specifically abrogated that rule by a clearly written statute. Compare Guillen v. Transit Mgmt. of Se. La., 648 So. 2d 487, 489 (La. Ct. App. 1994) (holding that the Regional Transit Authority is a common carrier and owes "the highest degree of care . . . to a fare-paying passenger"), with Jacobs v. Reg'l Transit Auth., 872 So. 2d 571, 573 (La. Ct. App. 2004) ("[T]he [Regional Transit] [A]uthority shall not be deemed to be a common carrier, or interpreted to be such by any court of this state in a suit for personal injury or property damage." (emphasis omitted) (quoting La. Stat. Ann. § 48:1656(23) (enacted 1995))).

D.

We cannot conclude that the Legislature intended that the tens of thousands of people in New Jersey who daily rely on public transportation would not have similar protections as those who travel on vehicles owned by private carriers. A passenger's expectation of safety on a bus does not vary depending on who owns the carrier. See, e.g., Lopez, 710 P.2d at 912. Most commuters do not have a choice whether to take public transportation to get to and from work, and many others rely on public transportation for travel in general.

NJ Transit and its subsidiaries "are responsible for the provision of public mass transit services in the State of New Jersey. NJ Transit owns, controls, and operates equipment (such as railcars and buses), yards and facilities." N.J.A.C. 16:83-1.1. It, in effect, has a near monopoly on mass public transit, operating 2,221 buses along 251 bus routes and 1,231 trains and 93 light rail vehicles along 12 rail lines -- in all, performing nearly 270 million annual passenger trips.[10] Its stated "mission [is] to provide and safely manage mass transit services in New Jersey." N.J.A.C. 16:83-1.1.

---

[10] About Us, https://www.njtransit.com/about/about-us (last visited Dec. 30, 2020).

In the line of title, NJ Transit acquired the privately owned bus company, Transport of New Jersey,[11] formerly Public Service Coordinated Transport,[12] an operator of electric trolleys. In Harpell, we applied the heightened common-carrier standard to those electric trolleys. 20 N.J. 309. Sixty-four years and several mergers later, NJ Transit argues that its bus drivers should not be held to the same high degree of care imposed on those trolley operators -- a standard imposed today on all bus drivers of privately owned carriers, a standard imposed on stage-coach carriers in the nineteenth century, Derwort, 21 Conn. at 253-54.

The TCA does not command that discordant result. We hold that NJ Transit and its bus drivers are governed by the same common-carrier standard applicable to private carriers.

To be clear, although private and public common carriers must exercise a duty of care "consistent with the nature of [their] undertaking," Kinsey v. Hudson & Manhattan R.R. Co., 130 N.J.L. 285, 288 (Sup. Ct. 1943), they are not absolute guarantors of their passengers' safety and they cannot protect

---

[11] About Us: History & Structure, https://www.njtransit.com/about/about-us (last visited Dec. 30, 2020).

[12] See Frank J. Prial, Deadline Nears for Six Bus Lines, N.Y. Times, Dec. 2, 1971, at 94, https://www.nytimes.com/1971/12/02/archives/deadline-nears-for-six-bus-lines-intercity-must-find-buyer-by.html.

35

against all possible dangers, see ibid. Carriers are liable only for the wrongful acts of co-passengers who present "dangers that are known or are reasonably foreseeable," and only "if the utmost care could have prevented" the harm. Model Jury Charges (Civil), 5.73(A)(2); accord Lopez, 710 P.2d at 914. In this case, for example, had one of the teenagers unexpectedly thrown the bottle -- in the absence of any provocative conduct or warning -- defendants would not be liable under those circumstances.

V.

Defendants claim that they are shielded from liability by various TCA immunities. We now assess the applicability of those immunities to this case.

"Public officials are cloaked with immunity from, or with limitations upon, tort claims under certain circumstances designated in the TCA, N.J.S.A. 59:1-1 to 59:12-3." Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 582 (2009). "[W]hen one of the [TCA]'s provisions establishes liability, that liability is ordinarily negated if the public entity possesses a corresponding immunity." Rochinsky v. Dep't of Transp., 110 N.J. 399, 408 (1988) ("[I]mmunity is the dominant consideration of the [TCA]." (quoting Kolitch v. Lindedahl, 100 N.J. 485, 498 (1985) (O'Hern, J., concurring))).

Public employees and public entities, however, "ha[ve] the burden to plead and prove [an] immunity under the TCA." Leang, 198 N.J. at 582 (citing

36

<u>Kolitch</u>, 100 N.J. at 497). Typically, for purposes of judicial economy, a public entity or public employee should assert the immunity in a pre-trial motion for summary judgment, which, if successful, will bring the litigation to an end. <u>See</u> <u>ibid.</u> We share the trial court's concerns about defendants' delay in raising several claims of immunity until the time of trial, and we disapprove of the assertion of a TCA immunity for the first time in a post-trial motion.

Having said that, we will consider the merits of each immunity asserted, beginning with the failure-to-provide-police-protection immunity.

A.

Defendants cannot prevail in their invocation of the failure-to-provide-police-protection immunity in the circumstances of this case.

N.J.S.A. 59:5-4 provides that "[n]either a public entity nor a public employee is liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." Although this Court has yet to directly construe that provision of the TCA, it has been comprehensively analyzed by the Appellate Division. <u>See, e.g.</u>, <u>Lee v. Doe</u>, 232 N.J. Super. 569 (App. Div. 1989); <u>Suarez v. Dosky</u>, 171 N.J. Super. 1 (App. Div. 1979). The dominant theme of

N.J.S.A. 59:5-4 is the discretionary provision and allocation of resources -- in short, discretionary governmental decisionmaking.[13]

The Appellate Division in Lee noted "that N.J.S.A. 59:5-4[] precludes suits against municipalities and their responsible officers based upon contentions that damage occurred from the absence of a police force or from the presence of an inadequate one," observing that the number of "officers a town should employ, how each should be equipped and whether a town should have any police at all are political decisions which should not be made the subject of any tort duty." 232 N.J. Super. at 576 (quoting Suarez, 171 N.J. Super. at 9). In addition, in the absence of an official comment to N.J.S.A. 59:5-4, the Lee court turned to the interpretation given to the parallel provision of the California TCA. Id. at 578-80. As this Court has stated, the history of the California TCA "is particularly significant to our interpretation of the [New Jersey TCA], as are the interpretations of the California statute by its judiciary, both before and after our Legislature's enactment of the Tort Claims Act." Tice v. Cramer, 133 N.J. 347, 361-62 (1993) (citation omitted).

---

[13] The Appellate Division has recognized the distinction between the exercise of discretionary and ministerial duties in construing N.J.S.A. 59:5-4. See, e.g., Suarez, 171 N.J. Super. at 7-10 (refusing to grant police-protection immunity to officers who breached their ministerial duty to arrange for the transport of occupants of a disabled vehicle stranded on a highway, two of whom were later hit and killed by passing cars).

Section 845 of the California TCA is almost identically worded to and was the model for N.J.S.A. 59:5-4. Lee, 232 N.J. Super. at 578-79 (citing Cal. Gov't Code § 845). We therefore turn for guidance to the California Supreme Court's decision in Lopez and its analysis of Section 845 in a factual scenario strikingly similar to the one before us.

In Lopez, the plaintiff bus passengers brought a negligence action against the Southern California Rapid Transit District (Transit District) for injuries inflicted aboard one of its buses "after a group of juveniles began harassing other passengers and a 'violent argument' ensued." 710 P.2d at 908. The Transit District invoked Section 845's failure-to-provide-police-protection immunity. Id. at 914. The California Law Revision Commission's commentary on Section 845 shed light on the immunity's fundamental rationale, stating that "[w]hether police protection should be provided at all, and the extent to which it should be provided, are political decisions which are committed to the policy-making officials of government." Ibid. (quoting Cal. Law Revision Comm'n, Recommendation Relating to Sovereign Immunity 860 (Jan. 1963)).

The Lopez court rejected the Transit District's argument that the failure-to-provide-police-protection immunity applied, reasoning that the plaintiffs' claims did not implicate "budgetary and political decisions which are involved

39

in hiring and deploying a police force." Ibid. (quotation omitted). The court noted that the plaintiffs did not allege that the Transit District "was negligent in failing to provide police personnel or armed guards on board its buses," but rather that its bus driver was "aware of the violent disturbance, did absolutely nothing to protect plaintiffs, but simply continued to drive the bus as if nothing was wrong." Ibid. It further observed that "warning unruly passengers to behave, ejecting those who refuse to behave, and summoning the assistance of police" do not involve political or budgetary decisions or constitute "police services" or the type of discretionary decisions falling within the ambit of the immunity. Id. at 914-15.

The logic and reasoning in Lopez apply with equal force here. The teenagers in this case verbally harassed and physically threatened Maison, throwing objects at her and brandishing a knife, as the bus rolled on. During his testimony, Coats conceded that he could have "told [the teenagers] to knock it off, . . . pulled the bus over, . . . called [NJ Transit] control and . . . called police." Such simple and common-sense actions would not have constituted police services or political decisionmaking or involved any true exercise of discretion. Maison does not claim that NJ Transit should have allocated more resources for security on its buses or that Coats should have acted as would a police officer or thrust himself in harm's way to quell the

40

disturbance on the bus or make an arrest. Maison merely maintains that the duty to exercise the utmost care required that Coats take one or more of the steps that, in his testimony, he admitted were available to him.

We do not accept, as argued hypothetically by counsel for defendants before this Court, that the failure-to-provide-police-protection immunity shields from liability a public-carrier bus driver who observes through his rear-view mirror a sexual assault occurring in the back of the bus and who does nothing but continue on his route. That absurd result is not what the language of N.J.S.A. 59:5-4 demands or what the Legislature had in mind in enacting the failure-to-provide-police-protection immunity. Coats was required only to fulfill certain ministerial duties, as a common carrier, to safely transport his passengers. We therefore conclude that N.J.S.A. 59:5-4 does not apply here.

We now consider the other immunities asserted by defendants.

### B.

We reject defendants' argument that they are immune from liability on the basis that they failed to enforce a law. Defendants' fault lies not in their failure to enforce a law but in the breach of their common-carrier duty to exercise the utmost caution to protect Maison from the foreseeable harm caused by the wrongful acts of co-passengers.

41

The TCA provides that neither a public entity nor a public employee is "liable for any injury caused by adopting or failing to adopt a law or by failing to enforce any law." N.J.S.A. 59:2-4 (public entity); see N.J.S.A. 59:3-5 (public employee). The failure-to-enforce-any-law immunity may be invoked whenever the "critical causative conduct by government employees consists of non-action or the failure to act with respect to the enforcement of the law." Lee v. Brown, 232 N.J. 114, 127 (2018) (quoting Bombace v. City of Newark, 125 N.J. 361, 373 (1991)). In Brown, a case involving a wrongful-death action relating to a deadly fire in a home, the immunity applied to the city and its electrical inspector who, after discovering improper electrical wiring in the home and issuing a "Notice of Violation and Order to Terminate," failed to enforce the municipal building code by securing an emergency power shut-off or seeking corrective relief in court. Id. at 118-29. Similarly, in Bombace, another fire-related wrongful-death action, the city and its code enforcement officer were immune from liability for the enforcement officer's failure to prosecute building code violations issued to a landlord. 125 N.J. at 364-74.

Here, defendants never raised the failure-to-enforce-any-law immunity before or during trial, and therefore did not develop a record on the issue. Cf. State v. Witt, 223 N.J. 409, 418-19 (2015) (declining to address the lawfulness of a police stop raised for the first time on appeal because of an undeveloped

42

record). That immunity was raised for the first time in a motion for a judgment notwithstanding the verdict in what the trial court described as "[defendants'] making-it-up-as-they-go-along approach."

In the post-trial motion, defendants pointed to various regulations promulgated by NJ Transit, governing "the standards of behavior to be followed" by passengers, N.J.A.C. 16:83-1.1, which they purported that Coats failed to enforce.[14] Coats's failure to enforce those regulations, defendants argue, provides them with immunity from Maison's negligence action.

The regulations prohibit passengers from "throw[ing] . . . any projectile . . . or object," N.J.A.C. 16:83-3.1(a)(3); "[e]ngaging in, or threatening, fighting or other violent or tumultuous behavior" or "any course of . . . repeatedly committed acts with the purpose to alarm or seriously annoy [another] person," N.J.A.C. 16:83-3.1(a)(13)(i), (iv); and "striking [another] . . . or other offensive touching, or threatening to do so" to another, N.J.A.C. 16:83-3.1(a)(13)(iii). Another regulation gives NJ Transit the power to take action to enforce those regulations. N.J.A.C. 16:83-1.6 provides that "[i]f NJ Transit determines that any person's conduct violates any of these rules, that

---

[14] Those regulations were adopted pursuant to N.J.S.A. 27:25-5(e), and therefore defendants submit they have the force of law.

43

person shall be subject to such sanctions as deemed appropriate including ejection from the premises [and] arrest, pursuant to the applicable laws."

First, NJ Transit and Coats offered no deposition or trial testimony that bus drivers were given authority to enforce those regulations. Nor does N.J.A.C. 16:83-1.6 indicate that NJ Transit bus drivers are obligated or empowered to take enforcement action. The regulation does not identify the persons designated to determine whether a violation occurred or the sanctions to be applied. Clearly, the regulation does not give bus drivers the power to make an arrest, nor does it direct the bus driver to physically eject a passenger from a bus. Coats made clear in his testimony that he would not become physically involved in a confrontation on the bus.

Additionally, Coats was never asked questions about the regulations or whether he even knew of their existence. In accordance with his common-carrier duty to ensure the safety of his passengers, Coats knew generally that if an assault occurred on his bus, he should call NJ Transit, which, in turn would call the police or emergency medical services to the scene. Coats's common-carrier duties do not mirror a police officer's powers to make an arrest or a code enforcement official's authority to enforce a municipal building code violation in municipal court. Cf. Brown, 232 N.J. 114; Bombace, 125 N.J.

44

361. A bus driver is not a public official charged with enforcing specific criminal, fire, or building codes.

Coats's common-carrier duties merely required him to exercise the "utmost caution" in transporting his passengers safely, which, here, might have included him telling the unruly teenagers to stop harassing Maison or to get off the bus, or stopping the bus and alerting the NJ Transit control center, or summoning the police. See Lopez, 710 P.2d at 910-11. The "critical causative conduct" giving rise to Maison's injuries and her legal claims was defendants' breach of their common-carrier duties -- their failure to protect her from the reasonably foreseeable dangerous conduct of other passengers, not from Coats's purported failure to enforce NJ Transit's regulations. Cf. Brown, 232 N.J. at 127 (quoting Bombace, 125 N.J. at 373).

Moreover, NJ Transit's regulations -- even if bus drivers were charged with enforcing some of them -- could not extinguish centuries-long common-carrier duties. To hold otherwise would effectively allow public entities to immunize themselves from tort liability by enacting ordinances or promulgating regulations and pleading enforcement as a defense. See Levin, 133 N.J. at 42-43 (rejecting a similar argument because, "[w]ere it so, a public entity could easily insulate itself from liability . . . merely by enacting ordinances [prohibiting the conduct]").

45

In L.E. v. Plainfield Public School District, the Appellate Division rejected the assertion of a school district that it was immune from liability for the sexual assault of a student on school grounds based on the failure-to-enforce-any-law immunity. 456 N.J. Super. 336, 346 (App. Div. 2018). The L.E. court explained that the plaintiffs' claims were not based on "the non-enforcement of laws, but on the negligent discharge of the supervisory function that the school had already assumed when students were attending class." Ibid.

The reasoning of L.E. is equally persuasive here. Defendants cannot transform the violation of their common-carrier duties into a failure-to-enforce-any-law immunity to defeat Maison's negligence action.

C.

We also find no merit in defendants' contention that they are shielded from liability because of their good-faith enforcement of a law. N.J.S.A. 59:3-3 provides, in relevant part, "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." Defendants qualify for this immunity only if they engaged in some act or acts to enforce a law. See Bombace, 125 N.J. at 368. Here, however, Coats took no action to safeguard Maison from the predatory behavior of the teenagers tormenting her. Therefore, the good-faith piece of this immunity does not come into play.

46

We agree with the Appellate Division and trial court that N.J.S.A. 59:3-3 does not apply to this case -- a case premised on a claim of negligent inaction -- because Coats did not act to enforce any law.  Therefore, defendants cannot avail themselves of the immunity provided by N.J.S.A. 59:3-3.[15]

VI.

A.

Last, we address the issue of whether the trial court erred in not allowing an allocation of fault between defendants NJ Transit and Coats (negligent tortfeasors) and the unidentified bottle thrower (an intentional tortfeasor).  The trial court declined to place the bottle thrower on the verdict sheet for allocation purposes because he was not named as a party in the pleadings by either Maison or defendants.  Maison argues that allocating the entirety of the fault to defendants was appropriate because the bus driver's common-carrier duty obligated him to prevent the very harm that occurred -- the bottle thrower's assault on her.

The allocation-of-fault issue raised here is not new to us.  We rejected the very same argument advanced by the plaintiffs in Frugis v. Bracigliano, 177 N.J. 250.  Additionally, the plain language of the TCA does not require,

---

[15] Because we hold that Coats is not immune under N.J.S.A. 59:3-3, NJ Transit is not derivatively immune as his employer.  Cf. N.J.S.A. 59:2-2(b).

for allocation-of-fault purposes, that a tortfeasor be named as a party, although a plaintiff must have sufficient advance notice that a defendant intends to seek allocation as a contribution defense.

We start with a discussion of Frugis, which controls the outcome of this case.

B.

In Frugis, the plaintiffs, parents of victimized school children, filed a tort action against the defendant public school board and the defendant elementary school principal, who had "photographed scores of young male students in provocative poses and retained those photographs for his sexual gratification." Id. at 257-58. We found that the negligent school board had failed both to properly supervise the intentional-tortfeasor principal and to prevent his foreseeable predatory conduct. Id. at 268-73. Despite the school board's negligence in fulfilling its oversight responsibilities to safeguard the children in its care, we concluded that the TCA explicitly mandated apportionment of damages in cases involving negligent public entities and "other tortfeasors," regardless of whether the other tortfeasors' conduct was intentional. Id. at 276 (quoting N.J.S.A. 59:9-3.1).

The TCA established a comparative-fault scheme, strictly limiting the liability of public entities and public employees to the percentage of fault

directly attributable to them.  See id. at 275-77 (citing N.J.S.A. 59:9-3, -3.1, -4).  N.J.S.A. 59:9-3.1 provides the law governing this liability:

> Notwithstanding the provisions of [the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8] or any other law to the contrary, in any case where a public entity or public employee acting within the scope of his employment is determined to be a tortfeasor in any cause of action along with one or more other tortfeasors, the public entity or public employee shall be liable for no more than that percentage share of the damages which is equal to the percentage of the negligence attributable to that public entity or public employee and only to the extent authorized by [N.J.S.A. 59:9-2, -4].
>
> [(emphasis added).]

The plain language of the statute requires an apportionment of fault between tortfeasors, without exception, and regardless of whether a tortfeasor is named as a party in the action.  N.J.S.A. 59:9-3.1 provides for apportionment of fault between public-entity and public-employee tortfeasors and "one or more other tortfeasors" -- not "one or more other tortfeasors named as defendants or third-party defendants."  To be sure, if in a tort action a defendant public entity or employee intends as a defense to shift blame and allocate fault to another tortfeasor not named in the pleadings, fair notice must be given to the plaintiff to respond to that argument.

49

Moreover, we declined the plaintiffs' urging in Frugis to suspend on public-policy grounds the TCA comparative-fault scheme -- in direct contravention of the statute's plain language -- in circumstances where a public entity and employee breach a core duty, which is to protect a vulnerable person from the foreseeable harm caused by a third-party tortfeasor. 177 N.J. at 274-76, 279-81. Plaintiff here -- as the plaintiffs in Frugis -- fastens onto dictum in Blazovic v. Andrich, which suggested that comparative fault might not be appropriate where a tortfeasor's negligence arises from the breach of a specific duty to guard against the wrongful conduct of another. 124 N.J. at 111-12. We state again, as we stated in Frugis, "[n]either the language nor legislative intent of the TCA support the use of Blazovic's dictum to eliminate a comparative-fault analysis" and "to abrogate apportionment between a negligent public entity and an intentional tortfeasor under N.J.S.A. 59:9-3.1 and -4." 177 N.J. at 280.

We recognize here, as we did in Frugis, the "persuasive" policy concern that permitting comparative fault -- when the school board's paramount duty is to protect the children from the foreseeable dangers posed by third-party tortfeasors or when a common carrier's duty is to protect its passengers from a foreseeable assault by another passenger -- might tend to dilute or diminish the school board's or common carrier's duty. See id. at 268, 273, 281-83. But

50

that is a policy choice made by the Legislature, and our charge is to "enforce the language and purpose of the TCA," not to impose an alternative judicial course of action. Id. at 275, 280-81 ("Any other remedy must come from the Legislature."). We note that in the seventeen years since the Frugis decision, the Legislature has not amended the TCA's comparative-fault statute to address the concerns raised by the plaintiffs in that case. See Macedo v. Dello Russo, 178 N.J. 340, 346 (2004) ("[T]he construction of a statute by the courts, supported by long acquiescence on the part of the Legislature . . . is evidence that such construction is in accord with the legislative intent." (quoting Quaremba v. Allan, 67 N.J. 1, 14 (1975))).

## C.

Although we hold that the TCA mandates allocation of fault in this case, we are mindful of the challenge presented to a jury in apportioning fault between a negligent common carrier and an intentional tortfeasor who committed the very harm the carrier was obligated to protect against. See Frugis, 177 N.J. at 282. We acknowledge, as we did in Frugis, the "strong public policy considerations" that counsel in favor of giving guidance to the jury in the form of some model instructions "to minimize the likelihood of diluting the [carrier's] responsibility to protect its [passengers] from

51

foreseeable dangers, including those presented by [co-passengers]." See id. at 274-75, 282.

Specifically, in addition to the model common-carrier charge, Model Jury Charges (Civil), 5.73(A), the jury should be instructed that in determining allocation of fault it should consider the following:

> The apportionment of liability should reflect the extent to which defendants' failure to discharge their common-carrier duties exposed plaintiff, as a passenger in their care, to the intentional misconduct of another passenger.
>
> The apportionment of liability should not diminish the duty of defendants, as common carriers, to protect their passengers from foreseeable negligent or intentional torts by co-passengers.
>
> In apportioning liability, consideration may be given to whether NJ Transit promulgated effective policies for training its bus drivers in dealing with misconduct by passengers and whether the bus driver in this case was trained in those policies.
>
> Weight may be given to whether defendants' breach of their duty has contributed to the inability to identify the bottle thrower.
>
> [See Frugis, 177 N.J. at 282-83.]

Unlike in Frugis, here a prior jury has already returned a valid damages award, so the new jury need only allocate fault between the tortfeasors. On remand, the trial court should charge the new jury with the additional instructions and, after apportionment, mold the verdict accordingly. In the

52

new trial, the parties may mutually consent to reading the transcript testimony of the witnesses in the prior trial rather than call those witnesses again.

In light of our decision, we disapprove of the Appellate Division's directive in this case that if the new jury finds that the injuries inflicted by the bottle thrower were "so foreseeable" to the bus driver, then the entirety of the fault may be allocated to defendants. Maison, 460 N.J. Super. at 241-42. Nevertheless, foreseeability is an important factor to be considered in the determination of apportionment. Otherwise, we affirm the Appellate Division, including its determination that the damages award should stand and that the new jury should not be informed about the amount of the award.

VII.

We affirm and modify the judgment of the Appellate Division and remand to the trial court for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES SOLOMON and PIERRE-LOUIS join in JUSTICE ALBIN's opinion. JUSTICE PATTERSON filed a separate opinion concurring in part and dissenting in part, in which JUSTICES LaVECCHIA and FERNANDEZ-VINA join.

Anasia Maison,

Plaintiff-Respondent/Cross-Appellant,

v.

New Jersey Transit Corporation and
Kelvin Coats,

Defendants-Appellants/Cross-Respondents.

JUSTICE PATTERSON, concurring in part and dissenting in part.

I concur with the majority that defendant New Jersey Transit Corporation (NJ Transit) cannot rely on the Tort Claims Act (TCA) immunities that it asserts in this case:  the immunity for failure to provide police protection, N.J.S.A. 59:5-4; the immunity for failure to enforce a law, N.J.S.A. 59:2-4, :3-5; and the immunity for good-faith enforcement of a law, N.J.S.A. 59:3-3.  Ante at ___ (slip op. at 4, 36-47).  I do not view the circumstances of this case to satisfy the requirements of any of those statutory immunities.

I part ways with the majority, however, with respect to its imposition of the heightened "common carrier" standard of care on NJ Transit.  Ante at ___ (slip op. at 2-4, 20-41).  When it enacted the TCA nearly fifty years ago, the Legislature declared a public policy "that public entities shall only be liable for their negligence within the limitations of [the TCA] and in accordance with

1

the fair and uniform principles established herein."  N.J.S.A. 59:1-2.  It thus made clear that its waiver of sovereign immunity was strictly limited by the terms of the statute itself, and is not subject to expansion by case law.  Ibid.

I consider the TCA's plain language -- confirmed by its legislative history -- to express the Legislature's clear intent:  a public entity or public employee sued for ministerial acts and not entitled to statutory immunity may be held to the standard of reasonable care that governs ordinary negligence claims, but not a heightened duty of care such as that imposed in this case.  In my view, with no signal from the Legislature that it intends to subject NJ Transit to expanded liability under a heightened standard, the majority effects a stark and unwarranted change in the law.

I concur with the majority that the TCA's apportionment-of-fault provision, N.J.S.A. 59:9-3.1, mandates that the jury on remand be afforded the opportunity to allocate fault between NJ Transit and the intentional tortfeasor, the unidentified individual who threw a bottle at plaintiff Anasia Maison.  Ante at ___ (slip op. at 4-5, 47-51).  I do not agree, however, with the majority's mandated jury instruction regarding that allocation, which presses the jury to allocate most -- if not all -- of the fault in this case to NJ Transit.  See Ante at ___ (slip op. at 51-53).  I view the majority's jury charge to depart from the governing statutes' intent that the trier of fact independently

2

determine the allocation of fault, and our courts' traditionally neutral presentation of apportionment-of-fault questions to juries.

Accordingly, I respectfully concur in part with the majority's judgment and dissent in part from that judgment.

I.

A.

1.

The TCA's express terms and legislative history make plain the Legislature's intent that public entity liability be strictly confined within the parameters set by the TCA, and that any expansion of liability requires a statutory amendment. N.J.S.A. 59:2-1 prescribes that "[e]xcept as otherwise provided by [the TCA], a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."

Quoting the California Law Revision Commission's statement on the California Tort Claims Act, the Report of the Attorney General's 1972 Task Force on Sovereign Immunity's comment to N.J.S.A. 59:2-1 explains that

> the Legislation recommended by the Commission provides that public entities are immune from liability unless they are declared to be liable by an enactment. This would provide a better basis upon which the financial burden of liability may be calculated, since each enactment imposing liability can be evaluated in

3

terms of the potential cost of such liability. Should further study in future years demonstrate that additional liability of public entities is justified, such liability may then be imposed by the Legislature within carefully drafted limits.

[(quoting California Law Revision Commission, Recommendation Relating to Sovereign Immunity 811 (1963)).[1]]

The Legislature thus provided that public entities should be held liable for injuries only to the extent prescribed by statute. The TCA "supersedes all prior common law causes of action for the negligence of public entities." Margolis & Novack, Claims Against Public Entities, cmt. 2 on N.J.S.A. 59:1-1 (2020); see also Alston v. City of Camden, 168 N.J. 170, 181 (2001) (rejecting reliance on cases cited by the Appellate Division because they "were decided prior to the enactment" of the TCA provision governing that case); Tice v. Cramer, 133 N.J. 347, 355 (1993) ("The liability of [a] public entity must be found in the [TCA]."); cf. Kemp by Wright v. State 147 N.J. 294, 307-10 (1997) (concluding that the TCA impliedly repealed the preexisting statutory

[1] The TCA "was based upon findings and recommendations submitted in the Attorney General's Task Force Report, and incorporated almost entirely the proposed statutory provisions contained therein." Margolis & Novack, Claims Against Public Entities, at vi (2020). The Task Force Report's comments to the TCA "have the precedential weight and value of legislative history." Rochinsky v. Dep't of Transp., 110 N.J. 399, 407 n.4 (citing Costa v. Josey, 83 N.J. 49, 61 n.1 (1980) (Clifford, J., dissenting)); accord Smith v. Fireworks by Girone, Inc., 180 N.J. 199 n.2 (2004).

grant of qualified immunity to public health entities). The Legislature intended that the TCA be "strictly construed to permit lawsuits only where specifically delineated." McDade v. Siazon, 208 N.J. 463, 474 (2011) (quoting Gerber ex rel. Gerber v. Springfield Bd. of Educ., 328 N.J. Super. 24, 34 (App. Div. 2000)).

As this Court has held, the TCA "is dispositive, with respect to causes of action in tort accruing on and after [its effective date], of the nature, extent and scope of state and local tort liability and the procedural requisites for prosecuting tort claims against governmental agencies." Wright v. State, 169 N.J. 422, 435 (2001) (quoting Pressler, Current N.J. Court Rules, cmt. 17.1 on R. 4:5-4 (2001)); see also Kahrar v. Borough of Wallington, 171 N.J. 3, 10 (2002) (noting "the general rule that public entities are immune from tort liability unless there is a specific statutory provision imposing liability"). We therefore look to the TCA -- not to the common law that preceded it -- to determine the scope of public entity and public employee liability.

2.

The TCA's opening provision uses the term "negligence" to describe the cause of action that may be asserted against a public entity that is not subject to any TCA immunity. N.J.S.A. 59:1-2. It states that

> [t]he Legislature recognizes the inherently unfair and
> inequitable results which occur in the strict application

5

of the traditional doctrine of sovereign immunity. On the other hand the Legislature recognizes that while a private entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carry out the above legislative declaration.

[Ibid. (emphasis added).]

A second TCA provision similarly uses the term "negligence" to describe the cause of action against a public employee arising from his or her ministerial functions. N.J.S.A. 59:3-2. After defining the scope of public employee liability for discretionary activities, the statute states that "[n]othing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions." Ibid. (emphasis added).

The Legislature thus chose the word "negligence" in those two critical provisions to describe the standard imposed on public entities, N.J.S.A. 59:1-2, and public employees, N.J.S.A. 59:3-2, if they are not immune from liability pursuant to other sections of the TCA. That familiar term does not encompass any and all violations of the vast spectrum of duties imposed by tort law.

6

Instead, it denotes "a failure to exercise, in the given circumstances, that degree of care for the safety of others, which a person of ordinary prudence would exercise under similar circumstances." Model Jury Charges (Civil) 5.10A, "Negligence and Ordinary Care -- General" (rev. May 2009) (Model Charge 5.10A); see also Negligence, Black's Law Dictionary 1245 (11th ed. 2019) (defining "negligence" as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation").

As this Court recently explained, "[n]egligence is defined generally as the failure to exercise 'that degree of care for the safety of others, which a person of ordinary prudence would exercise under similar circumstances.'" Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 363-64 (2016) (quoting Model Charge 5.10A); see also Aiello v. Muhlenberg Reg'l Med. Ctr., 159 N.J. 618, 632 (1999) (defining negligence as "the failure to exercise reasonable care").

In other words, the term "negligence," unmodified by additional language, generally denotes a violation of the duty of reasonable or ordinary care. See Steinberg, 226 N.J. at 363-64; Aiello, 159 N.J. at 632; Model Charge 5.10A; "Negligence," Black's Law Dictionary (11th ed. 2019).

I respectfully submit that there is nothing ambiguous about the term "negligence" as it appears in N.J.S.A. 59:1-2 and N.J.S.A. 59:3-2. If there

7

were any uncertainty about the Legislature's intent when it chose that term, however, the TCA's legislative history would resolve it. See DiProspero v. Penn, 183 N.J. 477, 492-93 (2005) (noting that when a statute is ambiguous, "we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction'" (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004))).

The TCA was enacted in the wake of this Court's decision in Fitzgerald v. Palmer, 47 N.J. 106 (1966). There, Chief Justice Weintraub explained the distinction between the liability of private and public actors and identified "ordinary prudence" as the duty imposed on public entities to the extent that they may be held liable at all:

> A private entrepreneur may readily be held for negligent omissions within the chosen ambit of his activity. But the area within which government has the power to act for the public good is almost without limit, and the State has no duty to do everything that might be done. Rather there is a political discretion as to what ought to be done, as to priorities, and as to how much should be raised by taxes or borrowed to that end. If government does act, then, when it acts in a manner short of ordinary prudence, liability could be judged as in the case of a private party.
>
> [Id. at 109 (citing Amelchenko v. Borough of Freehold, 42 N.J. 541, 550 (1964) (emphasis added)).]

As the TCA's legislative history reveals, the "ordinary prudence" standard articulated in Fitzgerald for the government's limited liability

8

dovetailed with the Legislature's intent when it adopted core provisions of the statute. The legislative history to N.J.S.A. 59:2-3 states that the provision

> makes clear that once a public entity does act, then, "when it acts in a manner short of ordinary prudence, liability could be adjudged as in the case of a private party." Fitzgerald v. Palmer, 47 N.J. 106, 109 (1966). Thus this section adopts the test commonly applied by the courts that a public entity or public employee is liable for negligence in the performance of ministerial duties.
>
> [Task Force Comment to N.J.S.A. 59:2-3 (emphasis added).]

The legislative history of N.J.S.A. 59:3-2 confirms that the same reasoning applies to that section of the TCA. The Task Force Comment to that provision states that "[t]he reasoning contained in the comment to § 59:2-3 of this act is equally applicable to this section." That "reasoning," of course, includes the application of the "ordinary prudence" standard for public employees engaged in ministerial acts quoted above. See Task Force Comments to N.J.S.A. 59:2-3 and 59:3-2.

The Court's decision in Fitzgerald is also cited in the legislative history of N.J.S.A. 59:2-2. That section of the TCA provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A. 59:2-

9

2(a).  Noting that N.J.S.A. 59:2-2(a) contains "[t]he primary source of public entity liability," the Task Force Comment again acknowledged the vast scope of potential governmental liability and invoked the holding of Fitzgerald.  See Task Force Comment to N.J.S.A. 59:2-2.

Given the clear statement of legislative intent, this Court has reaffirmed that the ordinary negligence standard governs public employee liability for ministerial acts under N.J.S.A. 59:2-3.  In Henebema v. South Jersey Transportation Authority, the Court stated that "[i]f the action was ministerial, liability for the public entity is evaluated based on an ordinary negligence standard," a test distinct from the "more difficult threshold" that governs actions based on a public employee's discretionary acts.  219 N.J. 481, 490 (2014).  As leading commentators have noted, "[t]he test for negligence in the performance of ministerial duties is the ordinary prudence standard customarily used by the courts."  Margolis & Novack, cmt. 2 on N.J.S.A. 59:2-2.[2]

_____

[2]  The commentators cite two exceptions to that rule.  Margolis & Novack, cmt. 2 on N.J.S.A. 59:2-2.  First, for cases in which a public employee's negligence creates a dangerous condition, N.J.S.A. 59:2-2's vicarious liability provisions do not govern and the public entity may be held liable only pursuant to N.J.S.A. 59:4-2.  Ibid.  Second, law enforcement officers who "in good faith render[] care at the scene of an accident or injury," or transport a victim to a hospital or another facility, are held to a standard of gross negligence pursuant to the Good Samaritan Act, N.J.S.A. 2A:62A-1.1.  Ibid. The commentators identify no setting in which a public entity or public

10

On rare occasions, the Legislature has expanded public entity liability by statutory amendment. See, e.g., L. 2019, c. 239 (amending N.J.S.A. 59:2-1.3 by eliminating TCA immunity for public entities in actions for damages as a result of a sexual assault and amending N.J.S.A. 59:8-3 by lifting the TCA's procedural requirements in actions for damages as a result of a sexual assault); L. 1977, c. 122 (defining an "employer" for purposes of the Law Against Discrimination, N.J.S.A. 10:5-5, to "include[] the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies"). The Legislature, however, has never amended the TCA to impose on public entities or public employees not subject to immunities a duty of care in tort cases more stringent than the duty of ordinary prudence.

B.

In light of the TCA's statutory language and legislative history, it is unsurprising that this Court has never applied the enhanced "common carrier" standard to NJ Transit, a public entity sued many times in the course of its long history. Indeed, the majority identifies no New Jersey decision, other than the Appellate Division's holding in this appeal, imposing that heightened

---

employee is held to a more exacting standard than ordinary negligence such as the "common carrier" duty of care adopted by the majority. Ibid.

standard on any public entity or public employee subject to the TCA.  See

ante at ___ (slip op. at 20-41).

In the absence of statutory language or legislative history supporting its

conclusion, the majority offers several reasons for its determination.

First, the majority invokes a definition of the term "carrier" in N.J.S.A.

27:1A-65 for the proposition that NJ Transit should be held to a "common

carrier" standard of liability.  Ante at ___ (slip op. at 20-21).  The statute on

which the majority relies, N.J.S.A. 27:1A-65, is not part of the TCA -- indeed,

it has nothing to do with tort law.  See N.J.S.A. 27:1A-1 to -85 (the

Transportation Act of 1966).  It is, instead, a provision of a statutory scheme

whose purpose is "to provide for reduced bus and rail fares for senior citizens,

persons with disabilities, and all disabled veterans at State expense."  N.J.S.A.

27:1A-64(d).  In that statute, the Legislature authorized and directed the

Commissioner of Transportation

> to establish and implement a program to provide motor
> bus and rail passenger service for senior citizens during
> offpeak times and to provide motor bus and rail
> passenger service for senior citizens age 65 and older,
> persons with disabilities, and all disabled veterans at all
> times bus or rail service is offered, on regular routes of
> carriers within the State or between points in this State
> and points in adjacent states at one-half of the regular
> adult rates of fare, except that the reduced fare shall not
> be available to senior citizens, persons with disabilities,
> or disabled veterans traveling on commuter railroad
> trains operated during peak times which have been

12

designated by the New Jersey Transit Corporation as ineligible for round trip excursion fares.

[N.J.S.A. 27:1A-66 (emphasis added).]

In that statutory context, the term "carrier" is defined to denote "any individual, copartnership, association, corporation, joint stock company, public agency, trustee, or receiver operating motor buses or rail passenger service on established routes within this State or between points in this State and points in adjacent states." N.J.S.A. 27:1A-65.

In light of its exclusive focus on reduced transit rates for senior citizens and individuals with disabilities, the statute on which the majority relies says nothing about the "common carrier" standard of tort law, much less the TCA's constraints on public entity and public employee liability. The provision, I respectfully suggest, is irrelevant to this appeal.

Second, the majority relies on this Court's opinion in Lieberman v. Port Authority, 132 N.J. 76 (1993), for the suggestion that the Port Authority Trans-Hudson (PATH) train system operated by the bi-state-entity defendant in that case -- "and therefore NJ Transit by analogy" -- would be held to the common-carrier standard. Ante at ___ (slip op. at 23). Lieberman stands for no such proposition. As the Court there noted, "[i]n 1951, the Port Authority statutorily consented to suit, and thus it is not subject to the [TCA]." 132 N.J. at 82 (citing Williams v. Nat'l Car Rental Sys., Inc., 225 N.J. Super. 164, 168

13

(Law Div. 1988)).  Accordingly, when the Court held in Lieberman that "the [PATH] train system . . . meets the definition of a 'common carrier,'" id. at 86, it simply did not confront the issue raised by this appeal.

Third, the majority invokes "well over a century" of common law in New Jersey imposing a heightened standard of care on common carriers.  Ante at ___ (slip op. at 21-22).  The majority finds it significant that when the Legislature enacted the TCA, it was aware of case law holding that "under the doctrine of negligence, the degree of the duty owed to the public depends on the kind of activity undertaken and the risk involved."  Ante at ___ (slip op. at 25) (citing Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 543 (2013)).  To the majority, when the Legislature used the term "negligence" in the TCA, it must have intended that term to include "the duty to exercise reasonable or prudent care and the duty to exercise the utmost care, as in the case of common carriers."  Ante at ___ (slip op. at 25) (citing Prosser & Keeton on Torts § 34, at 208-14 (5th ed. 1984)).

In my view, the Legislature left no room for implicit common-law causes of action against public entities and public employees in the TCA; it expressly superseded common-law causes of action in the statute itself.  See N.J.S.A. 59:1-1; N.J.S.A. 59:2-1; Alston, 168 N.J. at 181; Tice, 133 N.J. at 355; Margolis & Novack, cmt. 2 on N.J.S.A. 59:1-1.  Moreover, the TCA

14

contains no statutory language or legislative history suggesting that the Legislature viewed the term "negligence" to denote anything other than the traditional definition adopted by this Court:  the failure to exercise the degree of care which a person of ordinary prudence would exercise under similar circumstances.  Steinberg, 226 N.J. at 363-64; Aiello, 159 N.J. at 632; Model Charge 5.10A; "Negligence," Black's Law Dictionary (11th ed. 2019).  The duty of "utmost care" at issue in this appeal is simply not incorporated in the term "negligence" as that term is generally used.[3]

Even if the Legislature's admonition in N.J.S.A. 59:1-2 that "public entities shall only be liable for their negligence within the limitations of this act" could somehow be construed to encompass the heightened standard of common-carrier liability, the legislative history dispenses with any such notion.  See Task Force Comment to N.J.S.A. 59:2-3 (stating "ordinary

---

[3]  The majority relies on the inclusion of the model jury charge titled "Carriers for Hire" in a set of model charges denominated "Other Negligence Actions," as support for the proposition that the term "negligence" in the TCA denotes a violation of the common-carrier duty of care.  Ante at ___ (slip op. at 25-26) (discussing Model Jury Charges (Civil), 5.73, "Carrier for Hire" (approved June 1988)).  Even if the manner in which our Model Jury Charges are organized constituted authority for the meaning of a statutory term, which it does not, it is clear that the category of charges entitled "Other Negligence Actions" was not intended to have such import.  That category includes Model Charge 5.75, for example, which addresses the separate tort of public nuisance. See Model Jury Charges (Civil), 5.75, "Nuisance" (approved Dec. 1987).

15

prudence" standard); Task Force Comment to N.J.S.A. 59:3-2 (incorporating by reference the Task Force Comment to N.J.S.A. 59:2-3).

The Legislature's express rejection of heightened duties in public-entity and public-employee cases is consistent with its overall approach in the TCA. When the Legislature diverged from the standard of ordinary negligence, as in the "palpably unreasonable" standard that governs actions based on a dangerous condition of public property under N.J.S.A. 59:4-2, it did so expressly and imposed a higher burden on claimants, not a lower one. The majority's incorporation of a heightened standard of care for this subset of public entity is utterly incompatible with the general construct of the TCA and, as noted above, one of its key provisions of defined liability.

In my view, the majority's assertion that common-carrier liability can be read into the TCA because it was part of the common law is fundamentally at odds with the statute's limited waiver of sovereign immunity. I respectfully suggest that if the Legislature had intended to incorporate common-carrier jurisprudence in the TCA, either at the time of its enactment or at a later stage, it would have done so in no uncertain terms, and would have explained how that higher standard could be reconciled with provisions of the TCA that expressly lessen the burden of due care placed on public entities.

16

Fourth, the majority cites the language in N.J.S.A. 59:2-2(a) that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of employment in the same manner and to the same extent as a private individual in like circumstances." Ante at ___ (slip op. at 24). On that basis, the majority concludes that absent an applicable immunity, the TCA "generally contemplates a symmetry of treatment between government actors and private actors." Ibid.

The Task Force Comment to that statute -- omitted from the majority opinion -- makes clear that the Legislature meant no such thing. After noting that N.J.S.A. 59:2-2(a) "provides a flexible liability provision which will permit the courts to adapt the principles established in this act to the particular circumstances of the cases coming before them," and that it permits courts to "continue to recognize common law immunities to the extent they are consistent with the provisions of this act," the Task Force stated:

> It is recognized, however, that the negligence principles commonly applied to private entrepreneurs cannot automatically be applied to public entities; for as pointed out by the New Jersey Supreme Court: "A private entrepreneur may readily be held for negligent omissions within the chosen ambit of his activity. But the area within which government has the power to act for the public good is almost without limit, and the State has no duty to do everything that might be done."
>
> [Task Force Comment to N.J.S.A. 59:2-2 (quoting Fitzgerald, 47 N.J. at 106).]

17

With that clarification of the provision's intent, it can hardly be asserted by the majority that the Legislature in N.J.S.A. 59:2-2 envisioned "symmetry" between public and private actors with respect to the question of negligence. Ibid.

Finally, the majority relies on two out-of-state cases that it contends to be analogous to this case: the California Supreme Court's decision in Lopez v. Southern California Rapid Transit District, 710 P.2d 907 (Cal. 1985), and the Supreme Court of Texas's in VIA Metro. Transit v. Meck, ___ S.W.3d ___, ___ (Tex. 2020) (slip op. at 1-2). Ante at ___ (slip op. at 28-31). In my view, both decisions address issues distinct from the question before the Court in this appeal, and neither supports the majority's position.

In Lopez, the California Supreme Court applied a provision of California's Tort Claims Act that barred the imposition of liability on a public entity for an injury, "whether such injury arises out of an act or omission of the public entity or a public employee or any other person," "[e]xcept as otherwise provided by statute." 710 P.2d at 909 n.2 (quoting Cal. Gov't Code § 815). Unlike this appeal, the California case involved a legislative enactment expanding the liability of public entities; the California Civil Code requires "[a] carrier of persons for reward" to "use the utmost care and diligence for their safe carriage," to "provide everything necessary for that purpose, and to

18

"exercise to that end a reasonable degree of skill." Id. at 909 (quoting Cal. Civ. Code § 2100). The California Supreme Court construed that statute to apply to private and public common carriers alike, and thus found it sufficient to satisfy the requirement that government tort liability be prescribed by statute. Id. at 909-14.

Unlike the California Legislature, our Legislature has not enacted any statute codifying the common-carrier duties that the majority imposes today. Lopez provides no authority for the majority's decision.

The Texas Supreme Court's decision in Meck is similarly based on a state statute that has no New Jersey counterpart. A section of the Texas Tort Claims Act provides for government liability for "property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment," if that property damage, personal injury, or death "arises from the operation or use of a motor-driven vehicle or motor-driven equipment," and "the employee would be personally liable to the claimant according to Texas law." ___ S.W.3d at ___ (slip op. at 15-19) (quoting Tex. Civ. Prac. & Rem. Code § 101.021(1)). Noting that Texas's Tort Claims Act, Tex. Civ. Prac. & Rem. Code §§ 101.001 to 101.109, "does not clearly abrogate the common law," the Texas Supreme Court held that the tort of "slight negligence" recognized in that state's

19

common law fell within the scope of the statutory waiver of immunity. <u>Id.</u> at ___ (slip op. at 17-18). The court accordingly imposed a heightened duty of care on the common-carrier defendant in that case. <u>Id.</u> at ___ (slip op. at 15-19).

In contrast, our TCA lacks a provision analogous to that addressed in <u>Meck</u>, <u>see generally</u> N.J.S.A. 59:1-2, :2-2, :2-3, :3-2, and it has expressly abrogated common-law actions, <u>see</u> N.J.S.A. 59:1-1, :2-1; Margolis & Novack, cmt. 2 on N.J.S.A. 59:1-1. <u>Meck</u> does not address the issue presented by this appeal.

In short, I view the Legislature to have the exclusive authority to impose a heightened common-carrier duty on public entities and public employees responsible for transporting passengers in our State. <u>See</u> Task Force Comment to N.J.S.A. 59:2-1. The Legislature may enact law to further the liability policies expressed by the majority -- or for any other reason -- but it has not done so to date. In the absence of legislative action, I do not view the majority's holding to comport with the TCA's "carefully drafted limits." <u>See</u> Task Force Comment to N.J.S.A. 59:2-1.

I would reverse the Appellate Division's decision with respect to the common-carrier standard and apply the standard of ordinary negligence in the retrial of this case.

20

## C.

I share the majority's conclusion that on remand, the jury should have the opportunity to allocate fault to both NJ Transit and the individual who threw the bottle at plaintiff. Ante at ___ (slip op. at 47-51). I view the plain language of N.J.S.A. 59:9-3.1, applied in conjunction with the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, and the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, to mandate that the jury be permitted to allocate fault to the intentional tortfeasor, should it choose to do so. See ante at ___ (slip op. at 47-51) (citing Frugis v. Bracigliano, 177 N.J. 250, 274-81 (2003)).

My concern with the majority's direction on this issue relates solely to the jury charge that the Court instructs the trial court to give in the partial retrial of this case. I view that charge to be contrary to the intent of the Comparative Negligence Act and to deviate from the manner in which juries have traditionally been charged on the allocation of fault.

The Comparative Negligence Act assigns to the factfinder exclusive responsibility to make findings of fact regarding "[t]he amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damages"; and "[t]he extent, in the form of a percentage, of each party's

21

negligence or fault," with the percentage of negligence or fault of each party based on one hundred percent, and the total of all percentages of negligence or fault of all parties adding up to one hundred percent.  N.J.S.A. 2A:15-5.2(a). In a jury trial, in which the jurors are the factfinders, the question of allocation is for the jury alone.  See Krzykalski v. Tindall, 232 N.J. 525, 534 (2018); N.J.S.A. 2A:15-5.2(a).

Our Model Jury Instructions envision that the trial court will instruct the jury on the duty imposed on each alleged tortfeasor as part of the jury charge on the relevant cause of action.  If a defendant in a civil case is alleged to have been negligent, for example, the trial court explains the duty of care that applies to that defendant as part of the negligence charge.  See Model Charge 5.10A (addressing the duty of ordinary care).  In a medical malpractice case, the court describes to the jury the duty of each defendant in a charge tailored to malpractice litigation.  See Model Jury Charges (Civil), 5.50A, "Duty and Negligence" (approved Mar. 2002) (addressing the duty in malpractice cases). The judge then charges the jury as to proximate cause and other elements of the relevant cause of action.  See, e.g., Model Jury Charges (Civil), 6.10, "Proximate Cause -- General Charge" (rev. Nov. 2019); Model Charges (Civil), 6.11, "Proximate Cause -- Routine Tort Case" (rev. Apr. 2016); Model

Jury Charges (Civil), 6.12, "Proximate Cause -- Concurrent Causes of Harm" (approved May 1998).

Our Model Jury Charges envision that the jury's apportionment of fault will be addressed separately from the question of duty, and that the court will neutrally present the question of allocation to the jury, without pressing the jury to allocate fault to any particular person or entity, or to refrain from doing so. Model Charge 7.31's first paragraph provides:

> If you find that the plaintiff and one or more individuals or entities were [negligent/at fault] and proximately caused the [accident/injury], then you must compare the [negligent conduct/fault] of those individuals or entities in terms of percentages. You will attribute to each of them that percentage that you find describes or measures his/her/its [negligent contribution/fault] in proximately causing the [accident/injury]. The percentages must add up to 100%. You should not allocate any percentage to any individual or entity who you have found was not both [negligent/at fault] and a proximate cause of the [accident/injury].
>
> [Model Jury Charges (Civil), 7.31, "Comparative Negligence/Fault: Ultimate Outcome" (rev. Sept. 2018).] [4]

---

[4] In a case such as this, in which the fault of the plaintiff is not in issue, the court would delete any reference to the negligence or fault of plaintiff, and would not give the "ultimate outcome" charge set forth in the second paragraph of Model Charge 7.31. See Note to Judge, Model Charge 7.31.

23

In contrast, the jury charge formulated by the majority for the retrial of this case takes an unmistakable position as to the manner in which the jury should allocate fault. With no discussion of any duty imposed on the alleged intentional tortfeasor, or of the assault and battery that all parties agree was committed against plaintiff, the majority's jury charge provides:

> The apportionment of liability should reflect the extent to which defendants' failure to discharge their common-carrier duties exposed plaintiff, as a passenger in their care, to the intentional misconduct of another passenger.
>
> The apportionment of liability should not diminish the duty of defendants, as common carriers, to protect their passengers from foreseeable negligent or intentional torts by co-passengers.
>
> In apportioning liability, consideration may be given to whether NJ Transit promulgated effective policies for training its bus drivers in dealing with misconduct by passengers and whether the bus driver in this case was trained in those policies.
>
> Weight may be given to whether defendants' breach of their duty has contributed to the inability to identify the bottle thrower.
>
> [Ante at ___ (slip op. at 52) (citing Frugis, 177 N.J. at 282-83).]

I view that charge to communicate to the jury that the law requires an allocation of most or all of the fault in this matter to NJ Transit, and further, that the judge would disapprove of a verdict apportioning substantial fault to

24

the bottle-thrower. In my opinion, that inequitable approach invites the trial judge to interfere with the factfinder's exclusive authority to apportion fault, as envisioned by the Legislature in N.J.S.A. 2A:15-5.2.

I would instead direct the trial court on remand to instruct the jury on allocation pursuant to the first paragraph of Model Charge 7.31, modified to delete any reference to plaintiff's negligence, and leave the question of apportionment to the jury's independent judgment.

II.

I would affirm in part and reverse in part the Appellate Division's judgment, and respectfully concur in part and dissent in part.